AO 91
Rev. 11/97

CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>FREDERIC ALAN GLADLE<br>aka Walter Fred Boyd,<br>aka Larry Stauffer,<br>aka Jake Menefee | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br><br>11-  11-2410M |

CLERK U.S. FILED
OCT 1 4 2011
CENTRAL DISTRICT OF CALIFORNIA
BY ___ DEPUTY

Complaint for violation of 18 U.S.C. § 1343, wire fraud

| NAME OF MAGISTRATE JUDGE | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br><br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br><br>August 5, 2011 | PLACE OF OFFENSE<br><br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN)<br>512 Ladin Lane, Austin, Texas |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning no later than in or about November 2007, and continuing to on or about October 14, 2011, within the Central District of California and elsewhere, defendant FREDERIC ALAN GLADLE, aided and abetted by others, knowingly devised, participated in, and executed a scheme to defraud lenders by means of false and fraudulent pretenses, representations, and promises, and the concealment of material facts. Defendant and his co-schemers obtained bankruptcy petitions in the names of debtors unknown to defendant, transferred fractional interests in clients' properties to the debtors' names, and faxed bankruptcy filings and the fractional-interest deeds to the clients' lenders or trustees to invoke the bankruptcy stay and delay pending foreclosure sales of the properties. On or about August 5, 2011, defendant, for the purpose of executing and attempting to execute the above-described scheme to defraud, transmitted, willfully caused the mailing, and aided and abetted the mailing of the following item by means of an interstate or private carrier: an envelope sent via FedEx, an interstate carrier, which contained a prepaid debit card, from Ontario, California, to Austin, Texas.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

I hereby attest and certify on 12/27/11
that the foregoing document is a full, true
and correct copy of the original on file in
my office, and in my legal custody.

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

CLERK U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| Being duly sworn, I declare that the<br>foregoing is true and correct to the<br>best of my knowledge. | SIGNATURE OF COMPLAINANT<br>JANET AGHBOLAGHI<br>DEPUTY CLERK<br><br>KEVIN RYAN DANFORD, |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT FBI |

1180

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)<br><br>ANDREW J. WISTRICH | DATE<br><br>October 14, 2011 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

EJD:ejd        REC: Detention

# A F F I D A V I T

I, Kevin Ryan Danford, being duly sworn, hereby state as follows:

1.     I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI"), and have been so employed since March 2009.  I am currently assigned to the Mortgage Fraud Squad of the Los Angeles Field Office of the FBI, where I specialize in the investigation of mortgage fraud and related economic crimes. I am also a Certified Fraud Examiner.  Prior to working for the FBI, I was employed in the mortgage industry for more than seven years as a Loan Originator, Senior Underwriter, and Senior Loan Auditor.  As an FBI Special Agent, I have investigated and acquired experience and formal training in various types of federal financial crimes, including mortgage fraud, bank fraud, bankruptcy fraud, mail fraud, wire fraud, and money laundering. My experience includes interviewing witnesses, gathering and analyzing financial documents, conducting surveillance, serving grand jury subpoenas, and executing search and arrest warrants.

2.    As a Special Agent with the FBI, I have interviewed countless individuals involved in federal fraud offenses, including mail fraud.  Through my training and experience, I am familiar with the techniques and methods by which fraud offenders disguise and attempt to mask their illegal activities,

including their identities.  I make this affidavit in support

of: (1) a criminal complaint and an arrest warrant for FREDERIC

ALAN GLADLE, a/k/a Walter Fred Boyd, a/k/a Larry Stauffer, a/k/a

Jake Menefee, for violations of 18 U.S.C. § 1341 (mail fraud);

and (2) an application for a search warrant for the e-mail

account timelender@gmail.com that appears to have been used by

FREDERIC GLADLE to commit, and that may contain evidence of,

mail fraud, wire fraud, and bankruptcy fraud.

     3.    Title 18, United States Code Section 1341 states, in

pertinent part, that "Whoever, having devised or intending to

devise any scheme or artifice to defraud, or for obtaining money

or property by means of false or fraudulent pretenses,

representations, or promises…for the purpose of executing such

scheme or artifice or attempting so to do…causes to be deposited

any matter or thing whatever to be sent or delivered by any

private or commercial interstate carrier…shall be fined under

this title or imprisoned not more than 20 years, or both. If the

violation…affects a financial institution, such person shall be

fined not more than $1,000,000 or imprisoned not more than 30

years, or both."

     4.    The Special Inspector General of the Troubled Asset

Relief Program (SIGTARP) and the FBI opened this criminal

investigation in November 2010.  Since that time, I have been

the lead FBI case agent in this investigation.

    5.    The facts and information contained in this affidavit

are based upon my personal knowledge of this investigation, as

well as the observations of other law enforcement officers

involved in this investigation.  I have learned the facts set

forth in this affidavit several ways, including:  by reviewing

documents; by speaking with witnesses, other special agents, and

investigators; and based on my training and personal experience.

This affidavit is intended to show merely that there is

sufficient probable cause for the requested warrant and does not

purport to set forth all of my knowledge of or investigation

into this matter.  Unless specifically indicated otherwise, all

conversations and statements described in this affidavit are

related in substance and in part only.

## II. PROBABLE CAUSE

    6.    I am currently investigating a partial-interest

bankruptcy fraud scheme involving the borrowed[1] use of legitimate

---

[1]    The term "borrowed" refers to the fraudulent use of a
legitimate bankruptcy filing without the debtor's knowledge or
consent to make it appear to a lender whose loan is secured by
real property, that the debtor had an interest in the real
property so as to make the lender believe that the debtor's
automatic stay prevented the lender from foreclosing on the real
property.  To date, there has been no indication in this
investigation that the schemers delay foreclosure through any
means other than the use of a borrowed bankruptcy in combination

personal bankruptcies filed in the Central District of
California, and other jurisdictions around the country.  The
scheme is intended to, and has led to, the defrauding of lending
institutions and homeowners located primarily in California,
Arizona, and Texas.  As of August 2011, the scheme had borrowed
at least 431 bankruptcies filed in 28 judicial districts, in aid
of delaying foreclosure on approximately 750 properties.  The
scheme has also led to the theft of the identities of the 431
debtors whose names and, in some instances, forged signatures
have been used unbeknownst to them as purported owners of
partial interests in the 750 properties participating in the
foreclosure-delay scheme.

        7.    As described more fully below, my investigation of
this scheme reveals that GLADLE and his associates advertise and
represent to potential clients whose homes are, or may soon be
foreclosed upon that, in exchange for a monthly fee, GLADLE will
temporarily postpone the foreclosure for anywhere from six to 36
months.  GLADLE's clients are told that the postponement will be
achieved through the transfer of partial interests in their
property - though the evidence to date demonstrates that they
are not usually told that those transferees are debtors on

with a partial-interest grant deed.  In other words, the
investigation reveals that the delayed foreclosures are achieved
through illegal means.

4

bankruptcies – and that such transfers and filings are legal. In fact, GLADLE borrows legitimate bankruptcies by retrieving bankruptcy petitions from the Public Access Court Electronic Records ("PACER") online system, tells clients to execute and record partial-interest deeds in the names of these debtors without the debtors' knowledge, and then faxes the bankruptcy petitions and partial-interest deeds to clients' lenders and trustees to convince the lenders and trustees to postpone any scheduled foreclosure sale.

8.    In this scheme, GLADLE victimizes lenders because the fraudulent use of these bankruptcies generates automatic stays that prevent the lenders from foreclosing on homes upon which they are legally entitled to foreclose.  The debtors are victimized by having their identities stolen and bankruptcies borrowed, leading in many cases to the debtors having to defend against lenders' bankruptcy motions that allege that the debtors failed to disclose the partial interests that were transferred to the debtors without the debtors' knowledge.  Additionally, in cases where partial-interests are reconveyed to GLADLE's clients after the clients no longer receive the foreclosure-delay service, the debtors on those legitimate bankruptcies are victimized because GLADLE forges or causes others to forge the debtors' signatures on the fraudulent reconveyances.  Finally,

the clients are victimized because their properties are illegally and improperly transferred into legitimate bankruptcies, and have to rely on GLADLE effecting fraudulent reconveyances if they need to reverse the transfers to complete a sale or loan modification.

9.    After GLADLE and/or his associates recruit and obtain fees from a client whose house is being foreclosed upon, the scheme works as follows: (1) GLADLE and/or his associates provide to the client by e-mail or facsimile a pre-completed grant deed, which is a partial-interest grant of title in the client's house (such as 1/100 interest) from the client to the name of a unwitting bankruptcy debtor whose name is obtained from PACER, thus borrowing the legitimate debtor's bankruptcy; (2) the client signs and then records the partial-interest deed in the property being foreclosed upon and faxes the recorded deed directly to GLADLE at one of his efax numbers;[2] (3) GLADLE

---

[2]    j2 Global Communications, Inc. is a provider of electronic communication and remote computing services, including the use of telephone lines for the transmission of documents through the efax service.  According to the website www.efax.com, efax allows a user to send and receive faxes by e-mail.  The service allows a user to send faxes from an e-mail account to a physical fax machine by attaching a file or scanned hard copy of the document to an e-mail, and sending it to the recipient's fax number at, for example, 5551212@efaxsend.com.  The recipient who has a physical fax machine receives the file or scanned hard copy as a paper fax as if sent from a physical fax machine.  The efax service also offers the option for a user to receive voice mail messages in their e-mail as digital audio attachments.

uses the automatic bankruptcy stay to delay the foreclosure
proceedings by sending the legitimate (borrowed) bankruptcy
filing documents from PACER and the recorded partial-interest
deed to the foreclosing lender; (4) when lenders discover that
the partial-interest transfers to a debtor were made without the
debtor's knowledge, the lenders generally move in the debtor's
bankruptcy for Relief from Stay ("RFS"), to permit the lenders
to ignore the partial-interest transfer; and (5) as long as the
client continues to pay a monthly fee to GLADLE, GLADLE and/or
his associates repeat the same steps again using a different
debtor's name whenever a delay is required, after the earlier
transfer is mooted by an order granting a lender's Relief from
Stay motion or another bankruptcy order that negates any
delaying effect on the client's foreclosure sale, such as
dismissal or discharge of the bankruptcy. [3]

---

Thus, the efax service, which GLADLE uses regularly, integrates
and uses voice-mail, e-mail, and fax.

[3]     A property remains under the protection of a bankruptcy
stay until that bankruptcy is discharged or dismissed, or until
a lender obtains a RFS motion.  Once the bankruptcy stay no
longer applies to the client's property, GLADLE has the client
sign and record another partial-interest grant deed to the
debtor on another borrowed bankruptcy.  While a typical
bankruptcy may be in effect for 90 days or more, the client's
property may be deeded to the bankruptcy debtor at any point
during that bankruptcy and/or a successful RFS motion may be
granted at any point, so GLADLE charges a regular monthly fee
regardless of whether or not he uses another borrowed bankruptcy
for the client that month.  On one file, for example, according

10.  When a partial-interest deed has become useless through the granting of a Relief from Stay motion, or dismissal or discharge of the bankruptcy, or after the client withdraws from the foreclosure delay program, GLADLE may reconvey the useless deed(s) to the homeowner if the homeowner so desires. GLADLE achieves this reconveyance through fraudulent means, including through forgery.

11.  On June 9, 2011, a search warrant was executed on GLADLE's efax accounts at j2 Global Communications, Inc, ("j2 Global") for efax numbers (510) 225-2533, (512) 233-1786, (619) 923-3524 and (909) 494-8063, subscribed to GLADLE under the aliases of Walter Fred Boyd and Larry Stauffer, pursuant to a warrant approved by Central District of California United States Magistrate Judge Jay C. Gandhi on June 8, 2011 (hereinafter referred to as "the efax search warrant").  That warrant was based on an affidavit setting forth probable cause to believe that GLADLE's efax accounts were evidence and instrumentalities of criminal violations of 18 U.S.C. § 157 (bankruptcy fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), 18

---

to Shital Bhakta, J.D. of trustee Quality Loan Services, "Quality [Loan Services] delayed foreclosure action because we received notification of a bankruptcy.  The file would remain on "BK Hold" until the BK was dismissed, discharged/terminated, or relief from stay was granted.  We would postpone the sale in 30 day increments and then confirm whether the BK was still affecting the foreclosure."

U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 371 (conspiracy to defraud United States).  Seized pursuant to that warrant were 2,737 faxes and 25 voice mail messages sent to and from GLADLE through the efax system.

12.  On August 11, 2011, a consensual recording (hereinafter referred to as "the Consensual Recording") was made of a telephone conversation between GLADLE and client M.F.[4]   I have personally reviewed the call in full.  The call lasted approximately 28 minutes, during which GLADLE made a number of admissions relating to the scheme, including that "Fred Boyd" is an alias.  GLADLE did not reveal his true name on the call.

**I.    The scheme**

13.    The following information describing the nature and details of the fraud scheme at the center of this investigation was obtained through multiple sources, including interviews with clients and some of GLADLE's sales representatives.  People interviewed by SIGTARP SA Linda English and/or FBI Special Agent (SA) Travis Syfert included:   (1) clients Y.H., interviewed on October 29, 2010, R.P., interviewed on March 5, 2011, and M.F., interviewed on August 9 and 11, 2011, and (2) representatives Juan Jose Garcia ("Garcia"), interviewed on March 24 and March

---

[4]    Client M.F.'s criminal history was checked with the National Criminal Information Center (NCIC) and no convictions were listed.

25, 2011, Jeaneth Echeverry a/k/a Maria J. Pachon ("Echeverry"),
interviewed on March 28, 2011, Eddie Arreola ("Arreola"),
interviewed on June 23 and 24, 2011, and Irlanda Chavez
("Chavez"), interviewed on July 1 and 13, 2011.[5]  Three of the
four representatives interviewed are or were licensed realtors
in California.[6]  The information attributed to them in this
affidavit is based on those interviews, documentation provided
by the interviewees, and documentation obtained from the efax
search, unless otherwise noted.  According to sources detailed
below, the scheme operates as follows.

    A.    **The Sales Pitch: Postponing Foreclosure**

    14.    According to both GLADLE's clients and sales
associates, GLADLE solicited clients by mail, newspaper
advertisement, or word of mouth.

        a.    GLADLE associates Juan Jose Garcia, Eddie
Arreola, and Irlanda Chavez all told law enforcement that they
were clients of GLADLE, who held himself out to them as Boyd,

---

[5]    The criminal histories for clients Y.H and R.P., and
representatives Garcia, Echeverry, Arreola and Chavez were
checked with the National Criminal Information Center (NCIC).
The only conviction listed was on October 1, 2008 for Chavez for
felony arson, and she was sentenced to 3 years probation.

[6]    The realtor license numbers and status for the
representatives listed are:  Juan Jose Garcia #01337564, active;
Eddie Arreola #01790979, expired April 17, 2011; and Irlanda
Chavez #01376861, revoked June 2, 2010.

before they became his sales associates.  Garcia said he was

solicited through the mail by a foreclosure-delay company in

2007.  This solicitation led Garcia to communicate first with

"Brandon Michaels,"[7] which later led to direct communications

between Garcia and GLADLE at the soliciting company.  GLADLE

associates Garcia, Arreola, and Chavez all indicated that they

referred friends and family (or short sale clients in Chavez's

case) to GLADLE.

       b.   GLADLE Client R.P. told law enforcement that she

responded to an advertisement placed in a Peruvian newspaper.

When she called the number listed, she spoke to GLADLE associate

Jeaneth Echeverry, who said she could stop R.P.'s foreclosure

sale.  GLADLE Client M.F. told law enforcement that he was

referred to GLADLE, who held himself out to M.F. as Walter Fred

Boyd, by someone he paid to conduct a "forensic audit" on the

mortgage documents for his spouse's property.  M.F. initially

communicated through GLADLE's assistant, Roxanna Alas ("Alas"),

but later communicated directly with GLADLE via e-mail and

---

[7]    Brandon Michaels is a known alias for another subject in
this case for whom there are two outstanding arrest warrants in
the United States and one in Canada.  The warrants are for
Michaels' actions in previous versions of this same scheme:  NIC
#W040690405 (Los Angeles, California), and NIC #W042485826 (San
Francisco, California).  Garcia believed GLADLE worked for
Michaels, which corroborates other evidence obtained in the
course of this investigation, including the fact that Michaels
appears to have mentored GLADLE by teaching him how to conduct
this scheme.

telephone.  The substance of these communications centered
around delaying M.F.'s spouse's foreclosure.  GLADLE Client Y.H.
said he was solicited in part by a postcard and in part by his
own searches on the Internet; Y.H. dealt with Anthony Harmon,
who law enforcement have identified as one of GLADLE's
associates.

        c.    During the Consensual Recording on August 11,
2011, GLADLE explained how he solicited clients.  GLADLE stated,
in pertinent part,

> "[A] lot of homeowners keep on referring friends and
> family or I got realtors who send me clients. . .
> .[I]t wasn't until just the last couple years we even
> had rep[resentative]s, of people referring.  Normally
> our business was strictly, we'd send out postcards. .
> . .[T]he postcard would say, hey, do you need more
> time to stop foreclosure?...and people, you know,
> called voice mail, leave a message, we'd call you
> back…it was just a yellow card with the front of it,
> your address, the back would say what we're gonna, in
> bold, what we did, and that was it."

**B.    The Client Agreement**

        15.  GLADLE's clients sign a contract, or "Client
Agreement," with him before their foreclosure is delayed.  The

Agreement spells out the services to be provided by the salesperson (including "Suspend all Foreclosure actions" for six to 36 months against the property identified in the contract), the responsibilities of the client (including their promise not to contact the lender), the $760 monthly fees to be paid by the client (through Western Union, and later via Netspend cards[8]), the cancellation process, and the return of partial-interests in property that had been transferred to debtors upon the client's request, known as a reconveyance.  GLADLE associates Garcia and Echeverry supplied law enforcement with signed copies of four such contracts.  In addition, GLADLE associate Chavez supplied to law enforcement a Client Agreement that GLADLE sent by U.S. mail to Chavez's client R.P. in an effort to get R.P. to deal directly with GLADLE.  Dozens of similar Client Agreements were lawfully seized pursuant to the efax search warrant.  These seized Client Agreements were nearly identical to the ones provided by GLADLE associates, except for the clients' names,

---

[8]    NetSpend Corporation provides reloadable, prepaid debit cards that allow a customer to purchase and reload prepaid debit cards at more than 100,000 locations, such as retailers, check cashers, convenience stores, grocers, insurance providers, tax preparers and many others around the country.  In my training and experience, these accounts are often used by fraudsters to hide their true identity and/or to prevent law enforcement from tracing their transactions.  Such efforts to hide the source, location or control of monies that are either used to promote unlawful activities or that are proceeds from unlawful activities are considered a primary element in money laundering.

addresses, initial "origination service fee," and payment due

dates.  Each Client Agreement document displayed the header

"TIMELENDER, LLP  [or TL HOLDINGS] FORECLOSURE SPECIALISTS 1

MARITIME PLAZA, SUITE 1600, SAN FRANCISCO., [sic] CA. 94111."

16.  In the Consensual Recording between GLADLE and M.F.,

GLADLE referred to the Client Agreement, a signed copy of which

M.F. provided to law enforcement.  GLADLE stated to M.F., "if

you ever had to show a contract, you know, you can always show

the, the one I sent you."

**C.    Partial-Interest Grant Deeds Signed and Recorded**

17.  GLADLE provided instructions to his clients and

associates about the recording of grant deeds, which were in the

form of a cover sheet entitled either "Email Cover Sheet" or

"Fax Cover Sheet."  Dozens of documents seized in the efax

search that were sent from the clients to GLADLE had these cover

sheets attached to signed, notarized and recorded grant deeds.

GLADLE Client M.F. confirmed to law enforcement that he received

such a cover sheet by e-mail from GLADLE's assistant Alas at

GLADLE's direction, which was attached to an unsigned, partial-

interest grant deed; this cover sheet and deed were provided to

law enforcement and reviewed by your affiant.[9]  Each of the

---

[9]    In an e-mail from GLADLE at timelender@gmail.com to Alas at
alasroxana@yahoo.com on May 28, 2011, GLADLE stated, "I need a
new deed for [client M.F.'s spouse].  I need her to have it

14

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 16 of 68    Page ID #:16

seized cover sheets were similar in font and format, except for the name of the client to whom they were addressed. Each had the same company name in the heading: initially the company was called "TIMELENDER, LLP" and later it was changed to "TL HOLDINGS." The efax number from where the fax or e-mail originated changed over time, from an earlier efax number to one of two that were included in the efax search warrant, (510) 225-2533 and (512) 233-1786.[10]

18. A review of the cover sheet provided by M.F. reveals a header of "TL HOLDINGS EMAIL COVER SHEET" with "TO: [client M.F.'s wife]" and "From: FRED" below that header. The subheading, "Recording Instructions" contained the following bullet point instructions:

---

notarized by May 31st. I need it recorded and faxed to me by Friday June 3rd. Have her record everything the same way she did the first time. Thank you, WFB." That e-mail was then forwarded directly to M.F. by Alas later that same day, and attached to the e-mail was an unsigned, partial-interest grant deed from client M.F.'s wife to debtor V.R. (MIEBK 11-20873-RAG, filed May 24, 2011).

[10]    GLADLE changed fax numbers several times. According to an August 3, 2008 e-mail from GLADLE to his associate Garcia, containing the header, "From: timelender@gmail.com on behalf of W. Fred Boyd," GLADLE indicated that he was changing his fax number: "As of today, the 415-449-3428 is no longer operational. Please send all faxes to 512-233-1786."

      a.   "Take the Grant Deed to a Notary Public. Sign the Grant Deed in their presence and have your signature notarized."

      b.   "Take the Notarized Grant Deed to the Recording Office in your County Administration Building."

      c.   "Have the Grant Deed recorded.  There will be a small filing fee.  <u>BE SURE TO ASK FOR A COPY OF THE RECORDED GRANT DEED!!!</u>  <u>DO NOT LEAVE</u> the Recording Office without a copy of the recorded Grant Deed, stamped with proof of recording.  We must have that in order to stop your sale."

      d.   "Fax the copy of the recorded Grant Deed to me ASAP at the following fax number:  <u>1-510-225-2533</u>  . [sic] Call me when it's been faxed so I can get the sale stopped.  Thanks, Fred."

19. One of the signed, notarized and recorded grant deeds seized from the efax search warrant was sent from GLADLE client M.F.'s spouse to GLADLE.  That grant deed was a grant of 1% interest from GLADLE client M.F.'s spouse to bankruptcy debtor T.D., and was recorded in San Bernardino County, California.  According to the time stamp from the efax search, that deed was recorded and faxed to GLADLE on March 18, 2011.[11]

---

[11]   T.D. was the legitimate debtor on a bankruptcy filed in Ohio on March 9, 2011 (OHNBK 11-11851).  According to trustee NDeX West, it received that bankruptcy filing and grant deed via

20.  GLADLE associate Garcia provided law enforcement with copies of eight recorded partial-interest grant deeds and three unrecorded partial-interest grant deeds used in delaying foreclosures for clients R.P., M.G., J.L., S.A., and O.M.  The deeds all had the same format and all granted a 1% ownership in each client's property to the persons named thereon, who were bankruptcy debtors.  Garcia said he faxed these deeds directly to GLADLE on behalf of his clients, for GLADLE to then send to the clients' lenders to delay a pending foreclosure sale.[12] Dozens of similar grant deeds sent by Garcia to GLADLE were seized in the efax search.

21.  Client R.P. stated that she and her son went to Echeverry's home and signed a grant deed because Echeverry said that would stop the foreclosure sale.  A copy of that recorded

---

fax on March 23, 2011, which then caused it to postpone the foreclosure auction from March 23, 2011 to April 26, 2011 because of the bankruptcy stay.  PACER records show GLADLE did not access and print off the bankruptcy filing for T.D. until March 17, 2011, indicating the deed was backdated.  In fact, GLADLE associate Chavez stated in an interview with law enforcement on July 1, 2011, that GLADLE (whom she knew as Walter Fred Boyd) told her that he backdated the deeds.

[12]    GLADLE associate Garcia provided to law enforcement a fax confirmation page, sent to one of GLADLE's efax numbers on June 11, 2008, on which Garcia had handwritten (prior to sending), "Fred, This is the confirmation received for Brandon's fax. Faxing you the two G. Deeds.  fax (512) 233-1786."

deed was included in the documents provided to law enforcement
by Garcia.

    22.   In the Consensual Recording, GLADLE told M.F.,
"I'm just now finishing up who needs deeds next week.
. . .I don't want you to go record a deed, you know,
if I don't need you to do that, if the sale got
postponed.  So yeah, I'll, so I mentioned to [M.F.'s
spouse] in an email that I'll be getting you a deed
next week."[13]

    23.   GLADLE also gave specific instructions to his
associates about the grant deeds.  In a document provided by
GLADLE associate Garcia to law enforcement, GLADLE stated, in
pertinent part,

*"From Fred*

*Starting immediately we are no longer accepting*

*recorded deeds 48 hours before the sale "NO*

*EXCEPTIONS".  We need to have recorded deed, notice of*

*trustee sale and funds 72 hours before the sale.  If*

*your customer is in the Riverside County area please*

*remember the Recorders office closes at 2:00 pm so*

---

[13]   The Consensual Recording was made on August 11, 2011, and
client M.F. had not received the e-mail about a new deed as of
September 26, 2011.

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 20 of 68    Page ID
#:20

*make sure you are getting your customers deeds
recorded prior to 2 pm. . . .*

*Here is when we need the recorded deeds:*

• *Monday Sales* - *We need the recorded deed, notice of
trustee sale and funds on Thursdays*

• *Tuesday Sales* – *We need the recorded deed, notice of
trustee sale and funds on Friday before 11 am*

• *Wednesday Sales* - *We need the recorded deed, notice
of trustee sale and funds Monday before 11 am.  We
would preferr [sic] Friday afternoon.*

• *Thursday Sales* – *We need the recorded deed, notice
of trustee sale and funds anytime on Monday*

• *Friday Sales* – *We need the recorded deed, notice of
trustee sale and funds anytime on Tuesdays*

*From now on all recorded deeds have to be typed out.
If it doesn't look professional we will not accept it.
We need existing customers recorded deeds and payments
72 hours before their sale. . . .If you have any
questions please feel free to call me.  WFB"*

**D.    Monthly Fees Charged**

24.  The client is charged a monthly fee in exchange for
GLADLE's promise to delay the client's foreclosure. According to

GLADLE's admissions captured on the Consensual Recording,
documents seized in the efax search, and documents provided by
GLADLE's clients and associates, the payments to GLADLE are made
variously through Western Union wire transfers, NetSpend cards,
or the use of bank accounts for which GLADLE holds the ATM card.

    a.   In the Consensual Recording, GLADLE stated, in
pertinent part,

> "the NetSpend thing is kind of new to us because we
> used to use Western Union, which costs like $60 to
> send a payment, you know, versus the $3.95 NetSpend,
> and NetSpend, you know, advertised, hey, you know,
> send money to friends with cards…or…have your friends
> send you money, deposit money in your cards. . . .
> [W]e've only been doing NetSpend for about 18 months.
> . . .I'm thinking about going back to Western Union
> for new customers, you know, so they send a payment to
> Western Union."

    b.   In the document previously described in Paragraph
23, in which GLADLE detailed to his associate Garcia which day
deeds needed to be recorded, GLADLE also discussed payments from
clients.  GLADLE stated, in pertinent part, "I highly recommend
*you* collect your customers payments up to a week before they are

due so there are no late penalties.  We prefer that you send us

the payment and not your customer."  (Emphasis added)

25.  On the Client Agreements, GLADLE directs clients to

make their initial payments via Western Union.  The Agreements

state, in pertinent part, "[t]he **Client** agrees to pay a monthly

service fee. . . .All payments must be in **CASH**, and made via

Western Union. . . .  **Client** understands that this monthly fee

is paid...for suspending the foreclosure for the above reference

property."  (Emphasis in original)

a.   GLADLE provided instruction sheets to both

clients and associates for making Western Union payments to him,

and dozens of these sheets were obtained from the efax search,

from client R.F., and from GLADLE associates Garcia and Arreola.

The instruction sheets were all similar and provided the name of

the receiver who would be picking up the funds and the test

question-and-answer that would allow the receiver to retrieve

the funds without showing their identification.

i.   GLADLE associate Arreola provided to law

enforcement a list of receivers (also referred to as couriers)

that GLADLE gave him.  The list had names for receivers in Los

Angeles (John Mercer, John Kim, Jason Lee, William Harris,

Robert Newman, Robert Watson, David Turner, Robert Paulson and

Peter Wright), Dallas (Wilma Harris, Jan Wright, Kim Wilson,

Roberta Newman, Roberta Watson and Roberta Paulson), and Austin,
Texas (Barry Brown, Mark Richards, Luke Marshall, Barry Mason
and Barry Wilson).

       ii.   GLADLE associate Garcia provided to law
enforcement seven completed instruction sheets that were sent to
receivers John Newman, John Warner, David Wilson, Robert Watson
and Robert Paulson.[14]   Garcia provided an additional 13 Western
Union Customer Receipts that did not have accompanying
instruction sheets.   Those receipts show payments were sent to
receivers David Turner, Jan Wright, Roberta Watson, William
Harris, Wilma Harris, Roberta Newman, and Kim Wilson.

       iii. Western Union provided documentation showing
that between July 24, 2008 and February 11, 2009, at least 77
wire transfers were sent to receivers who were specifically
listed on documents that GLADLE provided to Arreola.

26.   As previously noted, GLADLE himself admitted that he
directed clients to make payments through NetSpend.   Moreover,
in an e-mail exchange between GLADLE and client M.F., GLADLE
directed M.F. to obtain a NetSpend card, make his monthly

---

[14]   GLADLE associate Garcia handwrote "(512) 233-1786" as the
destination fax number on at least three of the completed
instruction sheets, and one of those instruction sheets included
a fax confirmation verifying successful transmission of the fax.
That fax number was included in the efax search warrant, and
additional instructions sheets were seized during that search.

payment onto the card, and send the card to GLADLE so GLADLE

could then withdraw the funds.[15]  In an e-mail dated July 21,

2011, sent from timelender@gmail.com[16] to [xxxxx@msn.com],

"Subject: Re: Foreclosure Stop Fee," GLADLE wrote,

> "please order a netspend card for either you or [your
>
> wife] to make your August payment.  Go online to
>
> www.netspend.com and order the card.  It takes about
>
> two weeks (no credit checks) [sic] It's a prepaid
>
> debit card.  When you get it contact me...Fred."

M.F. ordered a NetSpend card as instructed and mailed it to

GLADLE, which was verified by e-mail communications and FedEx

tracking receipt information.  M.F. informed law enforcement

that he made a payment to GLADLE on that card, and NetSpend's

transaction records confirm that a credit of $780 was added to

the card on July 25, 2011, and three withdrawals totaling $760

---

[15]    In the Consensual Recording, GLADLE admitted, "we don't use
the cards but just to take money out of them.  We don't use it
to, you know, purchase anything like a regular card that you
normally do."

[16]    According to Google, timelender@gmail.com is registered to
Walter Fred Boyd.  As previously stated, GLADLE admitted in the
Consensual Recording that Walter Fred Boyd is an alias he uses.
M.F. informed law enforcement that the caller he spoke to on the
Consensual Recording was the same individual who was
corresponding with him through the e-mail address
timelender@gmail.com.  Additional evidence tying GLADLE to Boyd
is detailed in the section, "II. GLADLE's Use of Multiple
Aliases to Further the Scheme and Evade Detection."

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 25 of 68    Page ID #:25

were made from the card at an ATM in Austin, Texas approximately 3 1/2 hours later.

27. In addition to instructing clients to make NetSpend deposits, GLADLE also accepted payments from his associates through NetSpend accounts. In a printout from Garcia's NetSpend online account, dated April 20, 2009, Garcia updated GLADLE on some of those payments, which were made to GLADLE aliases Boyd and Stuaffer:

> "Recent Transfers
> jakemenefee: $712.00 [04/20/2009]
> $712.00 to user j.menefee (acct #xxxxxx8046) - Fred,
> this payment is part of the $900 balance we owe to
> you. April 20th.
>
> jakemenefee: $500.00 [03/24/2009]
> $500.00 to user j.menefee (acct #xxxxxx8046) - Fred,
> the transfer has been made. Go ahead and collect the
> money. Thanks Juan Jose.
>
> larrystauffer: $500.00 [03/03/2009]
> $500.00 to user l.stauffer2 (acct #xxxxxxx2045) - This
> is part of my payment. JJ
>
> jakemenefee: $712.00 [02/12/2009]
> $712.00 to user j.menefee (acct #xxxxxx8046) -
> February payment for [client G.P.]
>
> jakemenefee: $500.00 [02/10/2009]
> $500.00 to user j.menefee (acct #xxxxxx8046) - Fred,
> here are the $500.00 from [client D.]"

28. Documents seized in the efax search and bank records obtained in the course of the investigation show that GLADLE

24

associate Kim Harmon, under the company name PMC Services,[17] made
her clients' payments to GLADLE by depositing money into Bank of
America accounts from which GLADLE then withdrew the funds using
ATM/debit cards linked to those accounts.  In a letter faxed
from Harmon to GLADLE on September 9, 2008, Harmon wrote, in
pertinent part, "I opened 9 business accounts to send 6 of the
cards to you so that you never had a western union problem from
my company."  Harmon then sent numerous faxes to GLADLE, seized
in the efax search, indicating what payments were made to which
cards.[18]  In a fax from Harmon to GLADLE on September 16, 2008,
for example, Harmon wrote,

> "Just deposited Dorothy, Genia, David [K.] and new
> client [P]hillip [P.] payment.  Card #6391 balance
> $505.00  Card #6706 balance $505.00  Card #6763
> balance $504.00  Card #6011 balance $995.00  Card
> #6276 balance $995.00  Total payments for $3480.00
> Thanks."

---

[17]    According to bank account printouts seized in the efax
search, PMC Services stands for Professional Mortgage
Consultation Services.

[18]    Seized documents also included online account printouts
from those same bank accounts.

**E.     GLADLE Fraudulently Borrows Legitimate Bankruptcies to Advance the Scheme**

29.     Using PACER account numbers SA4008 and WB1904, GLADLE signs on to various United States Bankruptcy Court electronic docketing systems and obtains both the names of debtors on legitimate bankruptcies and copies of their bankruptcy petitions.  These debtors' names are the same names to which GLADLE directs his clients to fraudulently transfer partial interests in their properties, as previously detailed in Section C.  The transfers are fraudulent because they are made after the bankruptcy is filed, although the grant deeds that GLADLE prepares are backdated (through the use of fraudulent notaries and other means) to make it appear that they were signed before the bankruptcy filing date.  Based on PACER access records, analyses by United States Trustee Program ("USTP") analysts, and analyses by Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") and FBI Special Agents, including your affiant, GLADLE has accessed and then used debtors' names from at least 431 bankruptcies filed in 28 judicial districts involving approximately 750 properties as of August 2011.  On the Consensual Recording and statements to witnesses whom law enforcement have interviewed, GLADLE made numerous admissions that corroborate these investigative conclusions.

26

a.    In the Consensual Recording, GLADLE stated to client M.F., in pertinent part, "I like to use fresh bankruptcies which buys you more time."

b.    In the Consensual Recording, GLADLE discussed whether his use of the bankruptcies in the scheme was legal.  He stated, in pertinent part, "it is a gray area because, you know, if you filed bankruptcy, you know, it's your bankruptcy.  It's to discharge all your stuff, it's really not, your bankruptcy is not intended to be used to help someone else out.  It's supposed to be just your bankruptcy.  But…until they change the law, you know, I feel like I'm Robin Hood to a degree."

c.    In an interview on July 1, 2011, GLADLE associate Chavez said that she challenged GLADLE, who she knew as Walter Fred Boyd, about the legality of using the grant deeds as a foreclosure-delay tool when she told him that, for the clients' property to be included in the bankruptcy stay, title to the clients' real property could not be transferred to a debtor after a bankruptcy had been filed.  According to Chavez, ***GLADLE responded that was the reason they had backdated the grant deed.***  Other evidence in this investigation corroborates GLADLE's admission of his backdating the deeds.

i.    In a Relief From Stay  motion filed by lender Accredited Home Lenders, Inc., on October 28, 2010, Case

No. 10-32381-JTM (Central Division of Utah, debtors Z.C.P. and

D.S.P.), the lender wrote, in pertinent part,

> "The debtors acquired the property…by a Grant Deed. . .
>
> .The grant deed was recorded September 21, 2010 after the
>
> debtors filed their *pro se* Chapter 7 petition. . . .The
>
> post-petition conveyance by an unrelated third-party
>
> California borrower and its effect on the Creditor
>
> constitute a scheme to delay, hinder, and defraud the
>
> Creditor."

The grant deed in question, which has been reviewed by law

enforcement, was dated September 1, 2010; the bankruptcy was

filed September 9, 2010, and according to PACER records, GLADLE

– through his known PACER accounts – first accessed that

bankruptcy on September 10, 2010, and printed off 30 pages of

documents related to that filing.

    **F.**    **GLADLE Directs and Causes the Fraudulent Recordings of**

               **the Partial Deeds Unbeknownst to the Legitimate**

               **Bankruptcy Debtors**

    30. A review of affidavits filed in connection with the

legitimate bankruptcies, has revealed that the bankruptcies and

debtors' names are used without the debtors' knowledge.

        a.   In an RFS motion filed by lender Wells Fargo

Bank, N.A. on July 9, 2009, Case No. 09-17108-JKO (Southern

District of Florida, debtor Y.P.), the lender described a one percent partial-interest transfer from borrower M.O. to legitimate debtor Y.P.  In the filing, the lender attached a copy of the grant deed, which was dated April 9, 2009 and notarized by GLADLE associate Arreola.  The lender also represented in the court filing that, "Upon information and belief, the Debtor does not know [M.O.] and was unaware of the 1% Grant Deed."  According to PACER records, GLADLE accessed that specific bankruptcy on May 26, 2009, and printed 30 pages of documents related to that bankruptcy filing.  Legitimate debtor Y.P.'s bankruptcy was filed on April 17, 2009, 39 days before GLADLE accessed the bankruptcy records.

b.    In a July 13, 2009 RFS motion filed by lender Deutsche Bank National Trust Company, Case No. 09-31173-LMK (Northern District of Florida, debtor N.V.M.), the lender stated that the conveying homeowner R.S. was apparently, "attempting to stall the foreclosure on this California property by conveying a portion of the property to the debtor. . . .  On or about June 23, 2009 the undersigned's attorney's office conferred [sic: confirmed] with Debtor's attorney's office that that the debtor has nothing to do with [homeowner R.S.] nor the above noted collateral."  According to PACER records, GLADLE accessed that specific bankruptcy on June 8, 2009, and printed 30 pages of

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 31 of 68    Page ID
#:31

documents related to that filing.  The legitimate debtor's
bankruptcy was filed on June 5, 2009, three days before GLADLE
accessed the bankruptcy records.

### G.  GLADLE Faxes Documents to the Bankruptcy Trustee to Delay His Client's Foreclosure Sale

31.  Pursuant to GLADLE's direction, after a client records
a partial-interest grant deed to the legitimate debtor and then
sends it to GLADLE, GLADLE faxes that deed along with the
borrowed bankruptcy voluntary petition and a cover sheet to the
lender's trustee.  Approximately 104 such faxes were seized in
the efax search, of which at least 14 were sent interstate from
California to Texas.  Pursuant to Title 11, United States Code,
Section 362, the existence of the legitimate bankruptcy coupled
with the fraudulently conveyed partial ownership of GLADLE's
client's property, effects an automatic stay that prevents the
foreclosing entity from continuing with the foreclosure until
authorized by the bankruptcy court through time-consuming
processes such as RFS motions.

a.  On the cover sheets seized in the efax search,
GLADLE often explicitly explained to the trustee that the fax
included bankruptcy information in order to stop the scheduled
foreclosure auction.  For example, on a June 8, 2009 cover sheet
faxed from GLADLE to trustee Quality Loan Services, GLADLE

wrote, in pertinent part, "THE FOLLOWING IS BANKRUPTCY
INFORMATION REGARDING THE ABOVE REFERENCED PROPERTY.  THE SALE
IS SCHEDULED TODAY AT 10:30AM."  Attached to GLADLE's cover
sheet was a partial-interest grant deed and a copy of a
previously filed bankruptcy petition.  Similarly, on another
cover sheet faxed on August 4, 2009 to trustee Cal-Western
Reconveyance, GLADLE wrote, in pertinent part, "PLEASE FIND
ATTACHED A <u>GRANT DEED</u> ALONG WITH A <u>BANKRUPTCY PETITION</u> FOR THE
ABOVE REFERENCEDPROPERTY [sic].  THE SALE IS SCHEDULED TODAY AT
10:00 AM."

      b.   In some cases, GLADLE faxed a grant deed,
bankruptcy petition, and cover sheet to a trustee *after* an
auction in an attempt to reverse the sale of a client's
property.  For example, on a cover sheet faxed on June 3, 2009,
to trustee NDeX West, LLC, GLADLE wrote, in pertinent part, "THE
FOLLOWING IS BANKRUPTCY INFORMATION REGARDING THE ABOVE
PROPERTY.  THE SALE WAS 6-1-2009 BUT IS INVALID DUE TO
BANKRUPTCY.  THE BANKRUPTCY WAS FILED PRIOR TO SALE AND
THEREFORE THE PROPERTY IS PROTECTED BY THE AUTOMATIC STAY."
Attached to the cover sheet was a partial-interest grant deed
and a previously filed bankruptcy petition.  On another cover
sheet faxed on January 6, 2011, to "TRUSTEE SALES DEPT," GLADLE
wrote, in pertinent part, "THE SALE IS INVALID DUE TO

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 33 of 68   Page ID
#:33

BANKRUPTCY.  THE BANKRUPTCY WAS FILED AND RECORDED PRIOR TO THE
SALE AND IN REM ORDER, THEREFORE THE PROPERTY IS PROTECTED BY
THE AUTOMATIC STAY."  Attached to the cover sheet was a partial-
interest grant deed and a previously filed bankruptcy petition.
This evidence supports the conclusion that GLADLE intended and
understood the effect that his action would have on the
foreclosure.

      c.    In another example, a copy of GLADLE associate
Echeverry's partial-interest grant deed conveying 1 percent
ownership from herself to debtor C.M., (the debtor on bankruptcy
case number FLSBK 0812868-LMI, filed March 12, 2008), was seized
during the efax search along with a fax cover sheet showing it
was sent to GLADLE, as "Fred," by GLADLE associate Garcia.  A
copy of that same deed was obtained independently from the
trustee handling the foreclosure of that property, Quality Loan
Services, along with the C.M. bankruptcy petition and a cover
sheet from another of GLADLE's aliases, David Warner, to the
trustee.  Your affiant confirmed with the trustee that they
received by fax the deed and a copy of the bankruptcy filing,
and that their receipt of those documents caused them to
postpone the foreclosure on Echeverry's property.[19]

---

[19]    According to Shital Bhakta, J.D., of Quality Loan Services,
the deed to C.M. was one of five grant deed/bankruptcy petition
faxes received by their office, each of which caused a

**H.    GLADLE Repeats the Cycle**

32.    The process of having the client fraudulently grant a
1 percent ownership of his/her property into a legitimate
debtor's bankruptcy and then using that deed and bankruptcy to
delay a foreclosure, is repeated for as long as the client is
willing to pay for the service, or until a lender successfully
completes a foreclosure sale before GLADLE can fax the lender a
current foreclosure-delay packet.

a.    As previously described supra, the Client
Agreements state that, "[t]he foreclosure process can be delayed
six (6) to thirty-six (36) months."

b.    In one case of repeated delays, GLADLE associate
Garcia provided to law enforcement four grant deeds for client
R.P. that were dated and signed in succession from May 28, 2008,
when R.P. signed the contract with GLADLE, to March 2, 2009.  On
June 2, 2011 your affiant interviewed Lisa Markham, Senior
Supervisor, Recovery Department at CR Title Services, Inc., the
trustee handling the foreclosure of R.P.'s property.  According
to Ms. Markham, CR Title Services, Inc. received by fax all four

_____

postponement of the foreclosure.  A sixth bankruptcy filing by
the homeowner herself, Echeverry, was the last bankruptcy
Quality Loan Services received.  Bhakta stated they received the
referral to advance the foreclosure on December 5, 2007, and it
remained on bankruptcy hold until October 8, 2009.  They
received a new referral on February 23, 2010, and as of June 3,
2011, they had not yet gone to sale on the property.

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 35 of 68   Page ID #:35

grant deeds accompanied by copies of previously filed bankruptcy petitions, and as a result of that upon each receipt CR Title Services, Inc. placed a hold on the foreclosure proceedings.  CR Title Services, Inc. placed the first hold on May 12, 2008, while the fourth and final hold was released on July 13, 2009. The property was sold at auction on September 11, 2009. GLADLE's scheme successfully delayed foreclosure on this property for 17 months.

      c.   GLADLE associate Garcia provided to law enforcement two grant deeds for client O.M. that were dated and signed October 25, 2008 and January 9, 2009.  Public records show additional deeds for client O.M. were recorded until September 3, 2009.  As a result, GLADLE's scheme delayed foreclosure on O.M.'s home for at least 17 months.

      d.   GLADLE associate Garcia provided to law enforcement three grant deeds for client S.A. that were dated and signed December 2, 2008, February 16, 2009, and April 9, 2009.  Public records show additional grant deeds recorded as early as July 2, 2008 and as late as May 7, 2009.  As a result, GLADLE's scheme delayed the foreclosure on S.A.'s home for at least ten months.

      e.   GLADLE associate Garcia provided to law enforcement the Notice of Trustee's Sale for one of GLADLE

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 36 of 68   Page ID #:36

associate Echeverry's own properties.[20]  CR Title Services, Inc.
managed the foreclosure proceedings for this property, and
according to Ms. Markham, CR Title Services, Inc. received six
grant deeds for this property accompanied by copies of
previously filed bankruptcy petitions; upon the receipt of each
faxed package, CR Title Services, Inc. placed a hold on
Echeverry's foreclosure proceedings.  The first hold was placed
on August 6, 2008, and the final hold was canceled on December
27, 2010.  The lender CitiMortgage issued a new demand for
foreclosure to CR Title Services, Inc. on April 14, 2011.  As of
June 2, 2011, the foreclosure on Echeverry's property had been
delayed 34 months.

I.    GLADLE's Fraudulent Reconveyances

33.  In certain circumstances, such as a loan modification
or short sale, it becomes necessary to have a client's title
made whole, *i.e.,* have the outstanding partial interests granted
back to the homeowner.  To achieve this, GLADLE charges the
client an additional fee for GLADLE to prepare a notarized grant
deed purportedly from and signed by each legitimate bankruptcy
debtor, reconveying to his client the previously granted partial
interest.  As indicated above and below, the debtors' signatures

---

[20]    Echeverry had at least two properties for which she delayed
foreclosure through GLADLE's scheme.  Both properties were
located in the Los Angeles, California area.

on the reconveyances are forged, as they are unaware of GLADLE's scheme to borrow their bankruptcies and do not sign the reconveyances.

      a.   In an August 3, 2008 e-mail from GLADLE to his associate Garcia, with the header, "From: timelender@gmail.com on behalf of W. Fred Boyd," GLADLE wrote, in pertinent part, "As of August 1st, any client who cancels will have to make a final monthly payment and pay $125 for every reconveyance deed that is needed."

      b.   In the Consensual Recording, client M.F. asked GLADLE, "how, I mean, this will all clear out in the end, right, like as far as the title goes?" GLADLE responded, "Oh, absolutely, I reconvey title every week to people…in fact, I, I've got to do that today. I've got about ten, ten reconveyance deeds I've got to send out today."

      c.   GLADLE associate Garcia provided to law enforcement copies of four notarized reconveyance deeds prepared for client R.P., reconveying all interests purportedly held by the legitimate bankruptcy debtors back to R.P. The deeds all had the names of the grantors (the debtors) and grantees (the clients) handwritten in the appropriate blanks in the same handwriting, even though they were dated July 20, 2008, October 16, 2008, January 6, 2009, and March 10, 2009. Further, the

reconveyance deeds bore the notary stamp of the same notary in

Texas, Randall Peterson a/k/a Randy Peterson ("Peterson"), even

though three of the debtors filed their bankruptcies and listed

their street addresses thereon in the Southern District of

Florida and the fourth debtor filed and listed her P.O. Box

address thereon in Delaware.

      d.   GLADLE associate Garcia also provided to law

enforcement copies of two notarized reconveyance deeds for

client O.M., reconveying all interests held by the debtors back

to O.M.  The deeds both had the names of the grantors and

grantees handwritten in the appropriate blanks in the same

handwriting as those on the reconveyance deeds for R.P., even

though they were dated January 10, 2009 and March 1, 2009.

Further, the reconveyance deeds all bore the notary stamp of the

same Texas notary, Peterson, even though both debtors filed

their bankruptcies and listed their street addresses thereon in

the Southern District of Florida.

      e.   GLADLE associate Garcia also provided to law

enforcement copies of two notarized reconveyance deeds for his

own property and three for Echeverry's property, reconveying all

interests back to him and her, respectively.  All five deeds

bore the notary stamp of the same Texas notary, Peterson, even

though two of the debtors filed their bankruptcies and listed

their P.O. Box addresses thereon in Alaska; one debtor filed her

bankruptcy and listed her street address thereon in Hawaii,

while two other debtors filed their bankruptcies and listed

their street addresses thereon in the Southern District of

Florida.

      f.  At least 23 additional reconveyance deeds used in

the scheme were obtained by law enforcement from various

sources, including the Texas Secretary of State (from FN: Notary

Public Complaint -INPC #2279, filed March 23, 2011) and public

records.  All of those reconveyance deeds purportedly were from

bankruptcy debtors to clients and bore the notary stamp of the

same Texas notary, Peterson, even though none of the

bankruptcies filed by those debtors were filed in Texas.[21]

Further, out of the 33 total reconveyance deeds reviewed by your

affiant, including the ten provided by Garcia, there were three

instances in which a single debtor was used to reconvey title on

two different properties – six deeds total – and in each

instance, the debtor's signature on both deeds did not match

each other (debtors C.G., A.S. and E.G.); again, all six of

those deeds bore the notary stamp of Peterson.

---

[21]  Of the 23 bankruptcies, ten were filed in Florida, six in
Hawaii, two each in New Jersey and Kansas, and one each in
Colorado and Kentucky; the Colorado bankruptcy debtor was used
for reconveyances on two different properties.

    g. GLADLE associate Arreola provided three United States Postal Service Priority Mail envelopes to law enforcement that were sent to him by "W.F. Boyd" from the 2802 Flintrock Trace, Suite 254, Austin, Texas 78724 ("2802 Flintrock Trace") address.  Inside each envelope was an instruction sheet regarding reconveyance deeds, and all instruction sheets were the same.  The instructions stated, in pertinent part, "You need to record the reconveyance deed yourself. . . .If you have multiple reconveyance deeds, do not record them all at the same time.  Thank you, WFB."

## II. GLADLE's Use of Multiple Aliases to Further the Scheme and Evade Detection

  34. GLADLE uses the aliases Walter Fred Boyd ("Boyd"), Jake Menefee ("Menefee")[22] and Larry Stauffer ("Stauffer")[23] to

---

[22] There is a real person named Jake Menefee, but it does not appear that Menefee, who serves as Legislative Counsel for United States Representative Judy Biggert (IL-13th) in Washington, D.C., is involved in the scheme.  According to Menefee, who was interviewed by law enforcement on June 1, 2011, Menefee stated that he never opened an account for a prepaid credit card with Netspend, never rented a virtual office from Executive Suites at Flintrock, Austin, Texas, and never registered the e-mail address jmenefee@nyms.net – all of these are used by GLADLE in the scheme and are more fully discussed in the section, "II. GLADLE's Use of Multiple Aliases to Further the Scheme and Evade Detection."  Law enforcement has learned that the prepaid cards used by GLADLE in Menefee's name were obtained using Menefee's correct social security number but his incorrect date of birth.

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 41 of 68   Page ID #:41

further his fraudulent scheme.  As shown below, GLADLE uses these aliases in multiple ways:  in verbal and written communications with clients, associates and lenders' trustees; to register for e-mail and virtual office addresses, efax numbers, eVoice[24] numbers, and PACER accounts; to purchase prepaid debit cards; and to obtain telephone numbers.  These uses are connected primarily based on GLADLE's use of the same e-mail address – timelender@gmail.com – as the contact and forwarding e-mail address for those accounts, which were registered in the Boyd, Stauffer, and Menefee aliases.

---

[23]    There is a real person named Larry Stauffer, but his level of involvement in the scheme, if any, is unclear.  Based on law enforcement's analysis of Stauffer's bank accounts and activities , it does not appear that Stauffer, who resides in Georgia, is conducting himself or his financial affairs in a way consistent with participation in the scheme.  However, in a consensual recording on September 30, 2011 of a telephone call between the real Stauffer and real Menefee, Stauffer admitted knowledge of the virtual office address used by GLADLE in the scheme, and otherwise appeared to have some knowledge of GLADLE and/or GLADLE's use of Menefee's and Stauffer's identities.

[24]    eVoice is a telecommunications service offered by j2 Global.  The service is advertised on their website, www.evoice.com as a "Virtual Phone Number" with one of its core features being an "Auto Attendant," which is a feature subscribed to by GLADLE.  According to the eVoice website, "our auto attendant creates the appearance of multiple departments and employees."  Another core feature of the service is "Voicemail-to-Text," which allows a subscriber to "[r]eceive easy-to-read transcriptions of your voice messages delivered as a text message or email."

35.   In the Consensual Recording on August 11, 2011, GLADLE stated that, "I got to be honest, you know, with you, my name is not Fred Boyd...that's an alias."

36.   **GLADLE's Use of E-Mail Address timelender@gmail.com:** According to Google, e-mail address timelender@gmail.com is subscribed and registered to Walter Fred Boyd, and that address is the target of a search warrant application which this affidavit supports.  GLADLE uses this e-mail address to communicate with both his clients and associates, and he uses it as the direct and indirect contact e-mail address for his PACER, efax, NetSpend (prepaid debit card), Foreclosure Radar (foreclosure listing service) and telephone accounts, and for his virtual office address in Austin, Texas.

a.   **Communication with clients and associates** - GLADLE communicates with clients and associates using the Boyd alias and the timelender@gmail.com:

i.   In an October 27, 2009 e-mail from Boyd's timelender@gmail.com e-mail address to his associate Chavez, GLADLE wrote, in pertinent part, "Estela's sale was only postponed to Nov 2nd.  It should get extended on the 2nd, once they validate the [bankruptcy]…Fred."  On November 13, 2009, GLADLE wrote to Chavez again, in pertinent part, "I got Armando's sale postponed."

41

ii.   In a July 6, 2011e-mail from Boyd at
timelender@gmail.com to client M.F., GLADLE wrote, "[M.F.], have
you deposited your June payment yet?  If so, what account did
you stick it in?  W. Fred Boyd."

b.   **Direct contact e-mail** – When GLADLE registered
for one of his two PACER accounts and for his virtual office
(mail drop), he provided timelender@gmail.com as the contact e-
mail for those providers to reach him.  Further, when GLADLE
registered with j2 Global for two of his four efax numbers that
were included in the efax search, he had j2 Global set
timelender@gmail.com as the conduit e-mail address for inbound
and outbound efaxes:

i.   PACER account SA4008 was registered on June
8, 2009 under the name "Stauffer and Associates," with
timelender@gmail.com listed as the contact e-mail.  This account
was used to access approximately 2,700 bankruptcies between June
8, 2009, and September 21, 2011.  One of those bankruptcies,
R.B. (NJBK 10-11977), for example, was accessed by account
SA4008 on January 27, 2010, February 23, 2010, and September 2,
2010, and used to delay foreclosures on ten properties through
this partial-interest scheme.

ii.   GLADLE listed the 2802 Flintrock Trace
address in Austin as the contact address for both of his PACER

accounts, SA4008 and WB1904.  According to Executive Suites, the company that rents out that virtual address, the address is leased to the tenants Walter Boyd and Jake Menefee with e-mail address timelender@gmail.com.

       iii. The efax account for two of the four numbers searched, (510) 225-2533 and (512) 233-1786, was registered to Boyd on November 27, 2007, with timelender@gmail.com listed as both the contact e-mail and as the e-mail address through which all inbound and outbound faxes were to be routed.  From January 1, 2008 to March 8, 2011, according to toll records, approximately 4,975 total inbound efaxes for those two efax numbers were sent to GLADLE's timelender@gmail.com account, approximately 2563 of which were seized in the efax search.  Those seized efaxes consisted of grant deeds and payment information sent from clients to GLADLE, and client lists, grant deeds, Client Agreements and payment information sent from associates to GLADLE.

      c.  **Indirect e-mail contact** - GLADLE registered for efax, Foreclosure Radar and PACER accounts, purchased prepaid debit cards, and obtained telephone numbers using various other e-mail addresses that forwarded to timelender@gmail.com or had timelender@gmail.com listed as the secondary e-mail contact.

       i.    PACER account WB1904 was registered under the name "Walter Boyd & Associates" on May 26, 2009, with wboyd@nyms.net and timelender@gmail.com as the contact e-mail addresses.  According to the nyms.net e-mail host, Anonymizer, Inc., this nyms.net account is paid for by Boyd and it forwards directly to timelender@gmail.com, which links both e-mail addresses to GLADLE.  PACER account WB1904 was used to access 7,500 bankruptcies between May 26, 2009 and September 25, 2011. One of those bankruptcies, A.C.T. (FLSBK 09-26527), for example, was accessed by account WB1904 on September 7, 14, 15, 18, 21 and 23, 2009, October 23 and 24, 2009, November 5 and 20, 2009, December 3, 2009, and March 17, 2010, and it was used to effect the fraudulent delay of foreclosures on ten properties.

       ii.    The efax account for the first two of the four numbers searched pursuant to court order, (510) 225-2533 and (512) 233-1786, previously described as using timelender@gmail.com as its primary conduit e-mail, switched to list larry.stauffer@nyms.net as its conduit e-mail and Larry Stauffer as the account holder, as of March 8, 2011.  According to the nyms.net e-mail host, Anonymizer, Inc., larry.stauffer@nyms.net automatically forwards to timelender@gmail.com.

      iii.      The efax account for the remaining two of the four numbers searched, (619) 923-3524 and (909) 494-8063, was registered by Stauffer on May 22, 2009, with timelender@ymail.com (not timelender@gmail.com) as both the contact e-mail and the e-mail address to which all inbound faxes were routed.  According to Yahoo!, timelender@ymail.com was registered by "Mr. Time Lender" with alternate e-mail contact wboyd@nyms.net, and according to the nyms.net e-mail host, Anonymizer, Inc., wboyd@nyms.net automatically forwards to timelender@gmail.com.  From May 22, 2009 to March 1, 2011, according to toll records, approximately 2,599 total inbound and outbound faxes for those two efax numbers were sent to and from GLADLE's account, 119 of which were seized in the efax search (all outbound).  Of those efaxes seized, 104 were grant deeds and bankruptcy petitions sent to lenders' trustees.

      iv.   GLADLE used a prepaid debit card from NetSpend, xxxx-xxxx-xxxx-0668, to pay for: (1) PACER account SA4008;  (2) efax numbers (619) 923-3524 and (909) 494-8063; and (3) a subscription to www.ForeclosureRadar.com, an online service that provides information on foreclosure listings in Arizona, California, Nevada, Oregon and Washington.[25]  According

---

[25]    The subscription for ForeclosureRadar.com belonged to Boyd at the 2802 Flintrock Trace address, with e-mail contact

to NetSpend, the cardholder for that account was Stauffer with

the 2802 Flintrock Trace address and contact e-mail

larry.stauffer@nyms.net.  According to the nyms.net e-mail host,

Anonymizer, Inc., larry.stauffer@nyms.net automatically forwards

to timelender@gmail.com.

   v. GLADLE used another NetSpend card, xxxx-

xxxx-xxxx-1596, to pay for: (1) PACER account WB1904; and (2)

efax numbers (510) 225-2533 and (512) 233-1786.  According to

NetSpend, the cardholder for that account was Menefee with the

2802 Flintrock Trace, Austin, Texas address, and contact e-mail

jmenefee@nyms.net.  According to the nyms.net e-mail host,

Anonymizer, Inc., jmenefee@nyms.net automatically forwards to

timelender@gmail.com.

   vi. Through a series of voice mail systems and

automatic forwarding/auto-attendant services, GLADLE uses

telephone numbers to advertise to and speak with his clients.

These numbers are (or were, for the closed accounts) registered

using the aliases Boyd, Stauffer and Menefee, but they all used

e-mail contact addresses that lead back to a single e-mail

address: timelender@gmail.com.  For example, www.timelender.com

advertised a toll-free number for prospective clients to call

---

larry.stauffer@nyms.net, which automatically forwards to
timelender@gmail.com.

GLADLE, (877) 467-3731, which forwarded to eVoice[26] number (510)

225-4015 from May 2009 to September 2010, and which currently

forwards to eVoice number (510) 225-4025 since September 2010.

According to j2 Global, which provides the eVoice service, the

(510) 225-4015 number was registered to Boyd, paid for with

Netspend cards that Netspend shows were purchased in the names

of Boyd and Stauffer, and had the contact e-mail wboyd@nyms.net,

which, as noted above, automatically forwards to

timelender@gmail.com.  Similarly, the (510) 225-4025 number is

registered to Stauffer at the 2802 Flintrock Trace address, is

paid for by Boyd NetSpend cards, and has the contact e-mail

larry.stauffer@nyms.net, which automatically forwards to

timelender@gmail.com.

        vii. As another example, at GLADLE's instruction,

client M.F. called and spoke to GLADLE (who used the name Boyd),

at phone number (510) 520-5922 (the Consensually Recorded 28-

minute telephone call).  GLADLE also admitted on this call that

the name Boyd was an alias.  That (510) 520-5922 number is

registered to Menefee, with contact e-mail jmenefee@nyms.net,

which automatically forwards to timelender@gmail.com.

---

[26]    eVoice, as previously described in Paragraph 3, functions
as an "Auto Attendant," which "creates the appearance of
multiple departments and employees.  eVoice also includes a core
feature that allows the subscriber to "[r]eceive easy-to-read
transcriptions of…voice messages delivered as a text message or
email."

37.  **GLADLE's use of EFAX Numbers**:  GLADLE uses efax numbers to execute and promote the scheme, including to fax the partial-interest deeds and bankruptcy petitions to clients' lenders to postpone foreclosure sales.  The efax numbers that GLADLE uses are registered in the names of, and paid for by, the aliases Boyd, Stauffer and Menefee, which GLADLE is known to use.  Toll records for those efax numbers (namely, the four covered in the efax search warrant[27]) show that between April 18, 2009 and April 5, 2011, there were approximately 3,013 outbound faxes, of which at least 2,295 were sent to lenders' trustees. Of the outbound faxes, 119 were seized during the efax search,[28] and 104 of those were partial-interest deeds and bankruptcy petitions sent to trustees.  During that same time period for the same efax numbers, toll records show that GLADLE received approximately 5,171 inbound faxes and 82 inbound voice messages. Of those, approximately 2,682 inbound faxes and 25 voice messages were seized in the efax search, and at least 2,400 of those faxes were communications from clients and associates to GLADLE (but addressed to one of his three primary aliases),

---

[27]    These include:  (510) 225-2533, (512) 233-1786, (619) 923-3524 and (909) 494-8063 .

[28]    According to j2 Global, they were unable to provide most of the outbound faxes from the four efax numbers covered by the search warrant due to technical difficulties.

primarily consisting of recorded deeds and/or documentation of fees paid for the foreclosure-delay service.

     a.   In written instructions to his clients, GLADLE directed his clients to use his efax numbers when communicating with him.  In dozens of faxes seized in the efax search, and in documents provided by client M.F., there was an instruction sheet titled "FAX COVER SHEET…From: Fred" or "EMAIL COVER SHEET…From: Fred."  The sheets had the same instruction, "Fax the copy of the recorded Grant Deed to me ASAP at the following fax number:  1-510-225-2533."

     b.   GLADLE directed one of his clients to use one of these efax numbers in a solicitation letter that he sent directly to the client after GLADLE and his associate had a falling out.  In a letter obtained from that associate, Irlanda Chavez ("Chavez"), who obtained it from the client, GLADLE wrote, "My name is Walter F. Boyd (Fred) of TIMELENDER, LLP.  I am the person who has been postponing your foreclosure sales since December 5, 2008. . . .If you would still like to use my service please sign the enclosed contract and fax it back to me at 510-225-2533."

     c.   The four efax numbers searched are registered to and paid for by GLADLE's three aliases.  As previously detailed, the first two numbers, (510) 225-2533 and (512) 233-1786, were

registered to Boyd, and the contact and conduit e-mail addresses
for those numbers were timelender@gmail.com until March 8, 2011,
and larry.stauffer@nyms.net since then; and
larry.stauffer@nyms.net automatically forwards to
timelender@gmail.com.   The efax account for those two numbers
was paid for by various NetSpend cards purchased in the names of
Boyd, Stauffer, and Menefee.   The second two efax numbers, (619)
923-3524 and (909) 494-8063, were registered to Stauffer, and
the contact and conduit e-mail address was timelender@ymail.com,
which had an alternate e-mail address, wboyd@nyms.net, which
automatically forwards to timelender@gmail.com.   The efax
account for those two numbers was paid for by various NetSpend
cards purchased in the names of Menefee and Boyd.

    38.  **GLADLE's Use of PACER Accounts to Further the Fraud:**
The PACER accounts that GLADLE uses in the scheme, SA4008 and
WB1904, are used to borrow legitimate bankruptcies by accessing
their dockets and printing off copies of the bankruptcy petition
and other filed documents.   As previously set forth, these two
PACER accounts were used to access a combined total of
approximately 10,200 bankruptcies between May 26, 2009, and
September 25, 2011, of which approximately 431 have so far been
linked to this scheme.   The accounts were registered to Boyd and
Stauffer at the 2802 Flintrock Trace address, were paid for by

NetSpend cards purchased in the names of Menefee and Stauffer, and had e-mail addresses that forwarded to timelender@gmail.com.

39.    **GLADLE's Use of a Virtual Office to Further His Fraud And Evade Detection:**    GLADLE rents a virtual office address at 2802 Flintrock Trace, Suite 254, Austin, Texas 78734, that he uses both as a contact address for the logistical needs of the scheme and as a mail pick up location when receiving documents and payment from his clients and associates.    As previously detailed, that virtual address is leased to TL Holding and signed for by Walter Boyd as its representative with contact e-mail timelender@gmail.com.    One of the contact phone numbers on the lease is (888) 310-8463, which automatically forwards to (510) 225-4015, which was an eVoice number that was registered to Boyd, paid for by Netspend cards in the names of Boyd and Stauffer, and had the contact e-mail wboyd@nyms.net, which automatically forwards to timelender@gmail.com.

a.    The virtual office address is used as the contact address for GLADLE's PACER accounts (SA4008 and WB1904), efax numbers ((510) 225-2533, (512) 233-1786, (619) 923-3524 and (909) 494-8063), eVoice numbers ((510) 225-4025 and (510) 225-4040), and NetSpend cards (ending in -1596, -0389, -4187, -0668, and -0935), all in the names of Boyd, Stauffer and Menefee.

51

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 53 of 68    Page ID
#:53

      b.    The Flintrock Trace address in Austin is also used for mailings in the scheme, particularly mailings to and from clients and associates.

      i.    Using the Boyd alias, GLADLE used e-mail to direct client M.F. to obtain a NetSpend card, make his monthly payment onto the card, and mail the card to GLADLE at his virtual office address so GLADLE could then withdraw the funds. In an e-mail dated August 2, 2011, from [xxxxx@msn.com] to timelender@gmail.com, with the subject line "Re: Foreclosure Stop Fee," M.F. wrote, "Hello, Fred, I finally received my NetSpend card.  Where would you like it send[sic]?"  GLADLE responded that same day, "Please send it overnight 2 to 3 days is find[sic].  I want you to get a tracking number.  Several cards have not made it to the office.  Address: T L HOLDINGS, 2802 FLINTROCK TRACE, SUITE 254, AUSTIN, TX 78738  Email me the tracking number.  Thank you, WFB."  On August 5, 2011, M.F. e-mailed Boyd, "Hello, Fred...FedEx Tracking: 797382161417."  A printout from www.FedEx.com shows that the package identified by that tracking number was shipped from Ontario, California to Austin, Texas and was delivered to 2802 Flintrock Trace on August 9, 2011.

      ii.    GLADLE Associate Chavez stated in two interviews with law enforcement, on July 1 and 13, 2011, that

GLADLE (who held himself out as Boyd) always sent grant deeds to
Chavez via overnight mail.  The return address on one of those
mailings that was provided to law enforcement, a United States
Postal Service Express Mail envelope dated September 14, 2010,
was "WFB  2802 Flintrock Trace #254, Austin, TX, 78737."

    40.  **GLADLE's Use of Netspend Cards to Further His Fraud
and Evade Detection:**  GLADLE uses prepaid debit cards from
NetSpend to pay for efax, eVoice and PACER accounts and nyms.net
e-mail addresses used in the scheme, and the cards are obtained
using aliases.  He also uses the debit cards to collect payments
from clients.

    a.  GLADLE used at least nine different NetSpend
cards to pay for efax numbers (510) 225-2533 and (512) 233-1786,
and the cards were in the names of Boyd, Menefee, and Stauffer.
GLADLE used at least three different NetSpend cards to pay for
efax numbers (619) 923-3524 and (909) 494-8063, and those cards
were in the names of Boyd, Menefee, and Stauffer.  GLADLE paid
for both his former and current eVoice numbers, (510) 225-4015,
(510) 225-4025, and (510) 225-4040, with five different NetSpend
cards that were in the names of Boyd and Stauffer.  The PACER
account SA4008 is paid for with a NetSpend account in the name
of Stauffer, and the PACER account WB1904 is paid for with a
NetSpend account in the name of Menefee.  Finally, the e-mail

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 55 of 68    Page ID
#:55

addresses wboyd@nyms.net, larry.stauffer@nyms.net,

jmenefee@nyms.net, and timelender@nyms.net are all paid for with

NetSpend cards in the name of Boyd.

      b.   In the Consensual Recording, GLADLE discussed how

clients would respond to his solicitation postcards, and the

explanation included GLADLE's admission that he uses false names

on the NetSpend cards.  GLADLE stated, in pertinent part, "you

call the voice mail number which I'll give out to everybody…510-

225-4040…that goes into a rabbit hole.  You know I put, I use a

pre-paid debit card, you know, pay that bill down with a, you

know, when you grab a card and just stick a phony name on the

internet."

      c.   During that same recorded conversation, GLADLE

explained why he switched his customers to NetSpend cards,

stating,  in pertinent part, "the NetSpend thing is kind of new

to us because we used to use Western Union which costs like $60

to send a payment, you know, versus the $3.95 NetSpend, and

NetSpend, you know, advertised, hey, you know, send money to

friends with cards…or…have your friends send you money, deposit

money in your cards."

      d.   GLADLE further stated in the Consensual Recording

that he had customers in various states using NetSpend cards to

make their payments to him:  "I have clients all over the place

and I think when I had Arizona customers putting money on the California customers' card, I think that might have sent up a red flag. . . . I'm frustrated with myself because, you know, I'm learning as it is right here what, how to use these cards. In fact my next step is right now I've already separated everyone that has cards in Arizona and California and different, you know, different states."[29]

    e.  In some cases, GLADLE's sales associates would collect payments from clients and then pass those payments along to GLADLE through NetSpend cards. On a computer screen printout provided to law enforcement by Garcia, printed from Garcia's Netspend online account dated April 20, 2009,[30] there was a list of payments to GLADLE's accounts in the names of Menefee and Stauffer:

---

[29] According to comments GLADLE made in communications with client M.F., both by e-mail and voice mail, GLADLE became aware that a federal agent was asking his clients and associates about their use of NetSpend cards to pay for foreclosure delay services. He learned this when one of the associates that was interviewed notified GLADLE about the interview. GLADLE also learned that client M.F. was interviewed by the same federal agent, and the Consensual Recording was made during a return call to GLADLE upon GLADLE's request to M.F. seeking more information about that interview.

[30] Garcia voluntarily provided the printout from his Netspend account to law enforcement.

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 57 of 68    Page ID
#:57

"Recent Transfers

jakemenefee: $712.00 [04/20/2009]
$712.00 to user j.menefee (acct #xxxxxx8046) –
Fred, this payment is part of the $900 balance we
owe to you. April 20th.

jakemenefee: $500.00 [03/24/2009]
$500.00 to user j.menefee (acct #xxxxxx8046) –
Fred, the transfer has been made. Go ahead and
collect the money. Thanks Juan Jose.

larrystauffer: $500.00 [03/03/2009]
$500.00 to user l.stauffer2 (acct #xxxxxxx2045) –
This is part of my payment. JJ

jakemenefee: $712.00 [02/12/2009]
$712.00 to user j.menefee (acct #xxxxxx8046) –
February payment for [client G.P.]

jakemenefee: $500.00 [02/10/2009]
$500.00 to user j.menefee (acct #xxxxxx8046) –
Fred, here are the $500.00 from [client D.]"

41. **GLADLE's Use of Evoice to Further His Fraud and Evade**

**Detection:**  GLADLE regularly put his voice communications

systems in the names of his aliases.  GLADLE had three eVoice

numbers: (510) 225-4015, from May 2009 to September 2010; (510)

225-4025, from September 2010 to present; and (510) 225-4040,

from December 2010 to present.  From March 25, 2008 to December

31, 2009, the contact number on the 2802 Flintrock Trace virtual

office lease, (888) 310-8463, automatically forwarded to the

first number, (510) 225-4015, which was registered in the name

of Boyd and paid for with NetSpend cards in the names of Boyd

and Stauffer.  The number that associate Garcia used to call

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 58 of 68   Page ID
#:58

GLADLE (as Boyd), (888) 928-8463, automatically forwarded to
eVoice number, (510) 225-4015. As previously discussed, the
(877) 467-3731 toll-free number on the www.timelender.com
website used to solicit clients automatically forwarded to
GLADLE's eVoice number, (510) 225-4025, which was registered to
the name Stauffer and paid for with NetSpend cards in the name
of Boyd. Both the cell number used to register GLADLE's account
with Foreclosure Radar, (510) 520-9227, and the number that
client M.F. called GLADLE on when the Consensual Recording
occurred, (510) 520-9922, were registered in the name of Menefee
with contact e-mail jmenefee@nyms.net. GLADLE told M.F. in the
Consensual Recording that he was going to direct new customers
to (510) 225-4040, "you call the voice mail number which I'll
give out to everybody that they can give that to people because
there is a voice mail that, you know, I called you from it the
other day…(510) 225-4040." Finally, the number GLADLE used as a
business contact number, (512) 483-3872, when he set up the efax
numbers (512) 233-1786 and (510) 225-2533 under Stauffer's name,
was registered to Boyd.

### III. Identification of GLADLE as "Walter Fred Boyd"

42. Despite the use of multiple aliases in this scheme –
the fictitious name, Walter Fred Boyd, and the names of two real
people, Jake Menefee and Larry Stauffer – and the sophisticated

Case 2:11-cr-01170-URC   Document 1 *SEALED*   Filed 10/14/11   Page 59 of 68   Page ID
#:59

methods employed by the user of those aliases to hide his true
name, law enforcement has identified the person using the
aliases of Boyd, Menefee and Stauffer as **FREDERIC ALAN GLADLE**.
That identification was made using:  (1) PACER access records,
internet protocol ("ip") logon addresses and Internet service
provider ("ISP") subscriber information[31]; (2) witness and
surveillance photo identification; (3) the banking activity of
notary Peterson; (4) the unusual similarity between Boyd's
stated life history on the Consensual Recording and GLADLE's
documented life history; and (5) GLADLE's familiarity with the
scheme in the foreclosure delay on his own home in 2007, as set
forth below.  GLADLE's attempts to conceal his identity,
however, significantly frustrated law enforcement's efforts to
identify, locate, and attempt to put an end to GLADLE illegal
activities. His true identity was only uncovered very recently.

    43.  PACER/ip/ISP:  As previously described, the use of
PACER to retrieve bankruptcy filing information and documents is
central to the operation and success of this partial-interest
bankruptcy fraud scheme.  The two PACER accounts used, WB1904

---

[31]     According to www.wikipedia.com, "An Internet Protocol
address (IP address) is a numerical label assigned to each
device (e.g., a computer, printer) participating in a computer
network that uses the Internet Protocol for communication."
According to computer.howstuffworks.com, "Every machine on the
internet has a unique identifying number, called an IP Address."

and SA4008, accessed a combined total of approximately 10,200

bankruptcies between May 26, 2009, and September 25, 2011, of

which approximately 431 were used in the scheme.  Each time

either PACER account was accessed, a log was created by PACER

indicating what ip logon address was used to access the internet

at that moment.  Through August 31, 2011, the person(s) using

those ip logon addresses was shrouded in anonymity because the

ISPs used did not maintain subscriber information, and the PACER

accounts and payment methods for those accounts were all

established under the previously listed aliases.[32]  However,

starting September 1, 2011, and running through September 25,

2011, the two PACER accounts listed above were accessed 460

times from a single ip logon address, which law enforcement

determined belonged to Time Warner Cable through their Road

Runner internet division; Road Runner maintains subscriber

information.  According to Road Runner, the subscriber at that

ip logon address is GLADLE and the physical location for that ip

logon address is 512 Ladin Lane, Austin, Texas 78734 ("512 Ladin

Lane").  Public records and law enforcement databases show that

GLADLE purchased that house in December 1999, and that he shares

---

[32]    ISP's are not legally required to maintain subscriber
information for their clients.  In this case, the primary ISPs
used were Anonymizer, Inc., and Leap Wireless International,
Inc.

59

it with his wife, his 23 year old daughter, and his 20 year old
son.

44.    **Photo Identification:**    As previously established, the
virtual office located at 2802 Flintrock Trace, Suite 254,
Austin, Texas 78734, was used extensively for this scheme by the
person using the alias Boyd.    The virtual office was used both
as the mailing address for sending and receiving documents to
and from clients (see Paragraph 32 and section "IV. A Mailing
Covered by 18 U.S.C. § 1341 (Mail Fraud)" below), and as the
contact address for various services that were integral to the
scheme, most notably the two PACER accounts.[33]    That virtual
office is managed by Executive Offices, and when Whitney Miller
("Miller"), the secretary who works at the front desk at that
office location, was shown the Texas driver's license photo of
GLADLE, she identified him as the man who came in, identified
himself as "Fred" and paid cash for the Boyd account in or
around early September 2011.[34]    In addition, your affiant

-------------------

[33]    As detailed in Paragraph 32, other services used in the
scheme that were registered at the virtual office address
included efax, eVoice and Netspend accounts.

[34]    Miller was interviewed by FBI SA Stephen Callendar on
October 11, 2011, and when shown GLADLE's Texas driver's license
photo, she said she was "eighty-percent" certain that was the
same person that she personally received the cash payment from
in early September 2011.    Miller said that at the time of the
payment, she had an approximately ten-minute conversation with
him, and during that conversation, the man making the payment on

Case 2:11-cr-01170-URC    Document 1 *SEALED*    Filed 10/14/11    Page 62 of 68    Page ID
#:62

reviewed still photos made from surveillance video taken at that

virtual office location and compared them to GLADLE's Texas

driver's license photo, and they appear to show the same

individual – GLADLE – entering the office suite on multiple

occasions after hours.    Finally, according to Andrew Barney,

CFO for Executive Offices at that location, no one with the name

of GLADLE rents a virtual office address from them.[35]    GLADLE's

home residence at 512 Ladin Lane is located 3.3 miles from 2802

Flintrock Trace.

45.  **Notary Banking Activity:**  As previously discussed in

section "I. GLADLE's Fraudulent Reconveyances," 33 reconveyance

deeds used in the scheme were notarized by the same Texas

notary, Randy Peterson, and at least ten of those were sent by

the person using the alias Boyd to Boyd's associate Garcia.

Peterson has an established relationship with GLADLE:   GLADLE

---

the Walter Fred Boyd account said his first name was actually
Fred and that he had a daughter who was currently going to
college on a full volleyball scholarship.  Law enforcement has
verified that GLADLE has a daughter, Genevieve Gladle
("Genevieve"), and that, according to the websites
http://www.lamarcardinals.com/sports/w-
volley/mtt/gladle_genevieve00.html and
http://www.fanbase.com/Genevieve-Gladle, Genevieve was a
volleyball player at Lamar University from 2007-2009.

[35]    Mr. Barney was contacted by SA English on October 7, 2011.
Mr. Barney checked the client records in the Executive Offices
computer system and verified they had no clients by the last
name of GLADLE.

wrote six checks to Peterson totaling $32,800 that Peterson

cashed between June 20, 2007 and June 27, 2007, according to

Compass Bank

46. **Life History Match:**  In the Consensual Recording, the

person using the admitted alias of Fred Boyd stated that he used

to be an investment broker, "you know, I, I come from the

investment world myself and I had all the, all the licenses, you

know, I ran a brokerage firm and investment banking deal."  Boyd

then spent approximately five minutes discussing the deals he

once had that fell through.  According to a Financial Industry

Regulatory Authority (FINRA) report dated October 5, 2011,

GLADLE held securities licenses and a FINRA registration from

September 1983 until July 2004, when he was barred from

associating with any broker or dealer for five years pursuant to

a Securities and Exchange Commission (SEC) Administrative

Action.[36]

---

[36]    See SEC Administrative Release No. 34-50011, dated July 14,
2004, Docket/Case # 3-11546.  The SEC alleged that GLADLE sold
unregistered securities issued by three general partnerships in
New York, Nevada and Alaska, that GLADLE functioned as an
unregistered broker in selling those securities, and that those
sales were made using high-pressure "boiler room" tactics in
which material misrepresentations were made regarding the nature
of the operation and projected costs and returns.  The five year
bar was a settlement offered by GLADLE without admitting or
denying the charges, and it was accepted by the SEC.

47.  **GLADLE's Familiarity with the Scheme:**  GLADLE is
familiar with both the filing of bankruptcies and the granting
of deeds to debtors on legitimate bankruptcies because he did
both.  According to public and law enforcement databases, GLADLE
filed for personal Chapter 7 bankruptcy twice, in October 2005
and April 2007, using his own name, **FREDERIC ALAN GLADLE.**  Also
in 2007, GLADLE recorded grant deeds to the debtors on three
bankruptcies:  to T.S. (CACBK 07-14187, filed May 22, 2007) on
June 28, 2007; to P.D. (AKBK 07-00363, filed July 25, 2007) on
July 28, 2007; and to T.W. (AZBK 07-04094, filed August 20,
2007) on September 6, 2007.  The latter two were accessed on
PACER by a known associate of GLADLE, who is has been charged in
a two federal districts in a similar scheme.[37]

## IV.   REQUEST FOR SEALING

48.  GLADLE has gone to extreme lengths to avoid detection
and identification.  In addition to his use of multiple aliases
to register virtual offices, email accounts, and PACER accounts,
his use of anonymous ISP servers, and his payment for various
telecommunication services with debit cards in the names of
those aliases, indicate GLADLE's intention to avoid detection in

---

[37]    According to PACER, that account accessed the bankruptcy
for debtor P.D. on July 30, 2007, and the bankruptcy for debtor
T.W. on August 27, 2007.

an attempt to frustrate law enforcement's investigation of his illegal activities.

a. According to GLADLE associate Chavez, when Chavez threatened to give GLADLE's telephone number to an unhappy client, GLADLE responded that he was "a ghost."

b. GLADLE became aware that federal agents were inquiring about his NetSpend cards, and in the Consensual Recording, GLADLE stated the following:

    i.  "TL Holdings is just a fictitious name.  I just, you know, there's no corporation by that name."

   ii.  "I got to be honest, you know, with you, my name is not Fred Boyd."

  iii.  "[U]ntil they change the law, you know, I feel like I'm Robin Hood to a degree."

   iv.  "So did [Special Agent English] ask any questions about the grant deeds or the deeds or anything? . . . but the Austin address, I mean, did she mention anything about Austin, Texas?"

    v.  "I'm not sure how they found you."

   vi.  "I'm going to send out a letter to everybody basically trying to have you, if anyone