**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.**   **1-11-CR-708 (01) LY** |
| **v.** | ) | |
| | ) | |
| **FREDERIC ALAN GLADLE,** | ) | **Sentencing:**   **May 3, 2012** |
| **a/k/a Walter Fred Boyd,** | ) | |
| **a/k/a Larry Stauffer,** | ) | |
| **a/k/a Jake Meneffe,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## GOVERNMENT'S POSITION ON SENTENCING

The United States of America, by and through its attorneys, Denis McInerney, Chief, Fraud

Section, Criminal Division, U.S. Department of Justice, and Paul Rosen, Trial Attorney, files this

Sentencing Memorandum in the above-captioned case.

This case involves defendant having pled guilty to a two-count Information, charging

defendant with one count of bankruptcy fraud, in violation of 18 U.S.C. § 157, and one count of

Aggravated Identity Theft, in violation of 18 U.S.C. § 1028A.

## BACKGROUND FACTS AND CHARGES

Defendant's foreclosure-delay scheme was massive, nationwide, and lucrative.  During the

four years he operated the scheme, he delayed foreclosure of approximately 1,128 properties,

"hijacked" 273 bankruptcies in 28 judicial districts to perpetuate the scheme, and collected at least

$1,600,000 from his clients who were losing their homes.  (PSR ¶ 18).

Defendant began the scheme as a customer.  Initially, he was a foreclosure-delay client of a

man who defendant knew as Brandon Michaels in mid-2007.  Michaels delayed the foreclosure of

defendant's home, taught defendant how the foreclosure-delay scheme worked, and then agreed that defendant would act as a salesperson for Michaels' scheme in exchange for a commission of a few hundred dollars per client enrolled.  In mid-2009, defendant pretended to Michaels that defendant had decided to stop participating in the scheme, but in reality defendant started a competing scheme using the identical foreclosure-delay methods he learned from Michaels.  Defendant continued operating the scheme, including by recruiting his own salespersons, until he was arrested in October 2011.

The scheme operated as follows: (1) defendant and salespersons recruited by defendant would solicit distressed homeowners by offering to delay foreclosure for six to 36 months in exchange for a monthly fee; (2) defendant would access the Public Access Court Electronic Records ("PACER") to identify the names of debtors in newly filed bankruptcies and download the corresponding bankruptcy petitions, which defendant would use in the scheme as described below, without the debtors' knowledge; (3) after the homeowners paid the fee, defendant would send the homeowners grant deeds transferring fractional interests in their distressed property ("fractional deeds") from the homeowners to the names of the debtors whose names were used without their knowledge or permission by defendant; (4) upon defendant's instruction, the homeowners would record the fractional deeds, often with a defendant-provided fraudulent notary stamp affixed; (5) defendant would instruct clients to send the fractional deeds to defendant, who would then fax the fractional deeds and the corresponding bankruptcy petitions filed by the unsuspecting debtor to the distressed homeowners' lender, to cause the lender to halt the foreclosure based on the apparent automatic bankruptcy stay; (6) the defrauded lenders would file Relief from Stay or other motions in the bankruptcy case that had been appropriated by defendant, which would lead to the discovery

2

that the debtor's identity had been stolen and that the fractional deed was a sham; and (7) after the bankruptcy court granted the Relief from Stay or similar motion, defendant would appropriate another unsuspecting debtor's bankruptcy and repeat the process. (PSR ¶¶ 10-16). If a homeowner needed to void the fractional deeds, defendant would prepare quitclaim deeds in the names of all debtors listed on the fractional deeds, forge their signatures and notarize the forged signatures with a "rented" notary stamp, and forward the quitclaim deeds with forged signatures to the homeowners. (PSR ¶ 17).

Based on these and other facts, defendant pled guilty in Count One of the Information to bankruptcy fraud, in violation of 18 U.S.C. § 157, which carries a five-year statutory maximum sentence.

Throughout the scheme, defendant used made-up names or, on at least one occasion, the name of an identity theft victim, to avoid being detected. As noted in the PSR, a search of defendant's storage unit revealed that defendant had used the name and identifying information of J.M. to obtain a cellular phone account, on which he received at least $1,000 in services within a 12-month period. (PSR ¶ 19). However, in addition to this conduct, on which the 18 U.S.C. § 1028A aggravated identity theft count is based, defendant possessed and apparently used a cornucopia of identity theft and fake identification documents. Defendant's storage unit and other evidence revealed that defendant possessed: (1) a document with the names, addresses, telephone numbers, email addresses, and dates of birth of J.M., L.S., and S.J.; (2) prepaid accounts in the names of L.S. and J.M.; (3) fraudulent Texas driver's licenses in the alias names of Walter Boyd and Jack Heller; (4) Netspend cards in the names of J.M. and Heller; and (5) nearly $80,000 in U.S. currency. (PSR

¶ 20).  Defendant also used J.M.'s and L.S.'s names and the Boyd alias to sign up for email and PACER accounts.  (Id.).  It is apparent that defendant went to great lengths to avoid being caught.

## THE PLEA AGREEMENT

The parties agreed that, in addition to the two-year mandatory consecutive sentence required by the 1028A conviction in Count Two, the parties would not seek a Guidelines departure or a variance based on the 18 U.S.C. § 3553(a) factors from a low-end sentence based on the following calculations for Count One:

*Count 1: Bankruptcy Fraud, 18 U.S.C. §§ 157 & 2:*

| | | |
|---|---|---|
| Base Offense Level | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | |
| Loss Amount (gain to the Defendant of between $1,000,000 and $2,500,000) | +16 | [U.S.S.G. § 2B1.1(b)(1)(I)] |
| Bankruptcy involved | +2 | [U.S.S.G. § 2B1.1(b)(9)(B)] |
| Adjusted Offense Level | 24 | |
| Acceptance of Responsibility | -3 | [U.S.S.G. § 3E1.1] |
| Total Offense Level | 21 | |
| Criminal History | I | |
| Guideline Range | 37-46 months | |

Because defendant's Criminal History was, as anticipated in the Plea Agreement, within Category I, the government is required by the Plea Agreement to advocate exclusively for the above Guidelines calculation and to recommend that defendant be sentenced to the low-end of the 37 to

4

46 month guideline range for Count One.  Likewise, defendant is precluded by the Plea Agreement of arguing for a variance or Guideline departure from that range.  This would result in a Guidelines calculation for Count 1 of 37 months and Count 2 of 24 months, to be served consecutively, for a total of 61 months incarceration.  That is the government recommendation, based on the Plea Agreement, the Guidelines, and 18 U.S.C. § 3553(a).

### THE GOVERNMENT'S POSITION ON ADDITIONAL SENTENCING ENHANCEMENTS

The Probation Office disclosed the original PSR on February 17, 2012, but revised it on March 22, 2012.  This sentencing position is based on the revised PSR, including all addenda subsequently issued.

Defendant's Objections to the original PSR challenged four offense characteristics: (1) that the loss was more than $4 million, which was computed by combining victim loss with gain to the defendant, instead of the $1.6 million gain agreed to by the parties; (2) that there were more than 250 victims, instead of the zero then-identifiable victims agreed to by the parties; (3) that sophisticated means applied here, because the offense was "intricate in its commission and concealment"; and (4) that the offense involved the use of an authentication feature.

After receiving the original PSR, the government timely communicated its objections to the same four offense characteristics to the Probation Officer, as mandated by the Plea Agreement.  The Probation Officer stated that he would revise the PSR and include the government's objections to the PSR within the revised, final PSR.

The final PSR differs from the Plea Agreement only as to the number of victims and as to two, two-point enhancements:  sophisticated means (PSR ¶¶ 25, 46) and use of an authentication

feature (PSR ¶¶ 26, 47).  The government does not support the application of these enhancements.

First, as to the number of victims, although the number of victims (that is, lending / financial institutions) is accurately calculated by the probation office as between 10 and 50, at the time the parties entered into the Plea Agreement that figure was not readily ascertainable.  Thus, the parties did not include it, and based on the specific facts of this case including the facts known to the parties at the time of the entry of the Plea Agreement, the government does not support a victim enhancement in the guideline calculation.

Second, as to the sophisticated means characteristic, although the PSR identifies certain characteristics associated with the commission and concealment of the scheme that could be characterized as complex or intricate, such as defendant using aliases and assuming others' identities, the government did not include it within the Plea Agreement as it did not appear to be "especially complex or intricate," as required by U.S.S.G. § 2B1.1(b)(10)(C).

Third, as to the authentication feature characteristic, adding a two-point enhancement under this section in addition to imposing a two-year consecutive sentence on defendant for his 18 U.S.C. § 1028A count, would appear to be double-counting the same category of conduct, which is generally prohibited by the Guidelines, although the Guidelines are silent as to this type of double-counting.  Moreover, while not prohibited by the terms of the proffer agreement, the government obtained the notary stamp as a result of statements made by defendant in a proffer session.  Thus, while the derivative use of such information in this way would be permissible, the government does not seek to use the notary stamp against the defendant at sentencing and therefore does not support this two-point enhancement.

While the Court might find that any combination of these three enhancement applies to the facts of this case, based on the parties' Plea Agreement and the specific facts of this case, the government does not advocate for such enhancements. Even if the Court does find that these enhancements should apply to achieve the proper guideline calculation, the government maintains that in consideration of the 3553(a) factors, the appropriate, reasonable sentence for Count One is at the low-end of the 37 to 46 month guideline range.

## THE COURT SHOULD IMPOSE A 61-MONTH SENTENCE

The 18 U.S.C. § 3553(a) factors weigh in favor of the parties' joint recommendation of a 61-month custodial sentence with three years of supervised release to follow. Section 3553(a) requires that, in determining a sentence, the Court must consider:

> (1) the nature and circumstances of the offense and history and characteristics of the defendant;
> (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public from future crimes of the defendant, and provide the defendant with needed training and medical care;
> (3) the kinds of sentences available;
> (4) the kinds of sentences and the sentencing range recommended by the Guidelines;
> (5) any pertinent policy statement;
> (6) the need to avoid unwanted sentencing disparities; and
> (7) the need to restitute any victims.

*1.    Nature and circumstances of the offense*

Defendant's interview with the Probation Officer suggests that he will try to portray himself as a modern-day Robin Hood who committed crimes against lenders in order to help distressed homeowners remain in their homes. (PSR ¶¶ 37, 38). This portrait is false. Defendants foreclosure-prevention actions hurt lienholders large and small alike. And Robin Hood did not charge the poor for the benefit of being helped, but defendant collected at least $1.6 million from the supposed

7

beneficiaries of his altruism, almost all of which has vanished.[1]  As one targeted homeowner wrote in a letter to the Court, "Mr. Gladle, however, stole from the poor and desperate and hoarded the riches for himself."

Defendant acted not based on altruism, but greed.  He used aliases and assumed others' identities to avoid being caught, which are not the actions of a true believer. Defendant chose to provide a service that desperate homeowners badly needed, but he saw that it was easier to provide the service by committing a crime than by rolling up his sleeves and working within the law. Moreover, the losses suffered by financial institutions are not abstract; rather, they are simply passed down to law-abiding customers who in turn pay higher fees, interest rates, and other hidden costs that result from these losses.

In addition, defendant victimized J.M. by using J.M.'s identity to, among other things, apply for credit in the form of a cell phone account.  J.M. reported to the Probation Officer that defendant's theft of J.M.'s identity had caused J.M. "angst, embarrassment, fear and wasted unquantifiable amounts of time."

Defendant also appropriated the names and bankruptcy filings of more than 200 debtors, which caused at least some of the debtors to have to oppose motions that accused the debtors of failing to disclose their fractional interests in the properties that defendant had transferred into the debtors names unbeknownst to them.   One of those debtors, from Old Bridge, New Jersey, wrote

---

[1]  Defendant claims that he gave away 40-50% of his earnings to his church and the community.  (PSR ¶ 38).  The government is prepared to present at sentencing the testimony of a law enforcement witness who will testify that defendant stated in a proffer session that he tithed 10% of the earnings of his scheme to his church.  The witness will also testify that a former associate of defendant independently related to law enforcement that defendant told her that he gave 10% of is proceeds to his church.  Thus, it appears that defendant's representation to the probation officer is simply another in a long line of misrepresentations, in an attempt to gain sympathy with the Court.

to the Court and detailed that the hijacking of her bankruptcy, a time in her life when she was recently laid off as a school teacher and in deep despair, calling what she went through because of defendant's actions "one of the most stressful experiences of my life." Even if these debtors are not recognizes as victims within the Federal Sentencing Guidelines, defendant's decision to hijack these debtors' bankruptcies is certainly an aggravating factor that supports the requested 61-month sentence.

2.    *Defendant's history and characteristics*

Defendant has a single conviction, for battering his spouse. (PSR ¶ 56). He has no other criminal history.

Unlike many who come before the Court, defendant faced no unusual adversity such as coming from an abusive home or drug-infested neighborhood, which makes his decision to commit these crimes even less excusable. Defendant told the Probation Officer that he had a normal childhood, graduated from the Marine Military Academy, and then from the University of Southern California. (PSR ¶¶ 63-66). Defendant's father stated that defendant had a strong support system and that defendant had been brought up in a strict but loving environment. (PSR ¶ 66).

Defendant's children are all adults, ages 19 to 23, and defendant is married. (PSR ¶ 65).

Defendant's health issues are controlled with medication and he has no mental health or substance-abuse issues. (PSR ¶¶ 70-72).

Defendant's wife has a health issue and is unemployed. (PSR ¶ 75).

Defendant's employment history primarily revolves around positions of trust, including as a financial advisor and investment broker. (PSR ¶¶ 77-79).

9

Defendant recently was evicted, according to his attorney, but he lived without making a mortgage payment in the house for at least five years, from May 2006 until the preparation of the PSR. (PSR ¶ 83).

3.    *Need for the sentence to reflect the crime*

The crime was both large – 1,128 properties and about 273 hijacked bankruptcies were involved – and long in duration – four years, until the agents of the Federal Bureau of Investigation and Special Inspector General for the Troubled Asset Relief Program halted the scheme by arresting defendant.   Conduct of this duration cannot be considered aberrant; defendant woke up every morning and decided to continue committing crimes and collecting money from distressed homeowners instead of finding honest work.  Defendant's efforts to hide his identity and his decision to commit aggravated identity theft make his crimes more significant, and more deserving of a significant sentence.

Moreover, as the victim impact statements make clear, several debtors whose bankruptcies were hijacked also suffered.  Many of these debtors expressed how difficult the bankruptcy process is when it is not hijacked, and how much more difficult, stressful, and confusing defendant's action's made the process.  As one bankruptcy judge in Trenton, New Jersey said to a debtor a hearing on the matter, "this is clearly a fraud that you had nothing to do with."

Defendant's conduct harmed several categories of persons and institutions, and his punishment should reflect the scope of that harm.

4.    *Kinds of sentences available, including under the Guidelines*

A two-year mandatory consecutive term of imprisonment is applicable for Count Two, and a probationary sentence for Count One is permitted by law, but advisory under the Sentencing

Guidelines, because the sentencing range falls within Zone D of the Sentencing Table. U.S.S.G. §
5B1.1.

5. *Pertinent policy statements*

There are no applicable policy statements.

6. *Need to avoid unwanted sentencing disparities*

The recommended 61-month sentence is a low-end Guidelines sentence. Any lower sentence
than jointly recommended by the parties would create the risk of unwarranted sentencing disparities
compared to other similarly situated defendants who received a within-Guidelines sentence. This
is because the guideline range is properly reflected by the admitted and verified gain that defendant
obtained through the course of his illegal activities. (Indeed, this is a conservative estimate of
defendant's gain, as he himself his heard on jailhouse calls boasting to an even larger gain amount.)
To depart from that range would lead to defendant obtain a lower sentence that others who have
committed similar activities and profited similar amounts.

7. *Need to restitute the victims*

The government's proposed judgment would include restitution for the victims who provided
information to the government demonstrating a direct and proximate financial loss from defendant's
scheme. The victims in many cases were the financial institutions who were forced to file various
legal processes to lift the automatic stay that defendant achieved through his illegal activities. The
restitution calculation in this case, just like total loss calculation, is difficult to ascertain with
reasonable certainty. However, defendant should not reap a benefit from the mere fact that his illegal
conduct caused extensive losses that are not easily ascertainable. The following calculation proposed
by the government presents a conservative but realistic assessment of costs borne by many of the

11

victim-lending institutions during the period of time that defendant's illegal activities prevented the lenders from foreclosing on properties.

As set forth in the agreed upon statement of facts, defendant admitted to delaying the foreclosure of approximately 1,128 distressed properties over four years. Of those properties, the government was able to identify and send letters to about 159 victims (or their counsel) relating to 302 properties, which is the number of properties for which relief from automatic bankruptcy stay motions were filed. Of those approximately 159 victims contacted, several responded with cost breakdowns as to 54 properties, with calculations of actual costs that were a direct and proximate result of defendant's illegal activities. In the government's view, reasonable and readily ascertainable costs for each property include: (1) legal and attorneys' fees incurred to lift the erroneous automatic stays; (2) insurance payments made on the properties during the period of delay caused by defendant; and (3) property tax payments on the properties for the period of delay caused by defendant. The victims or their counsels that responded provided some combination of these loss figures, though several only included attorneys' fees and costs. The government excluded from any calculation as too speculative costs associated with depreciated property value or interest payments made on the mortgage principal for the period of delay, thus making the government's calculation extremely conservative.

As a result, the lender-victims submitted allowable, actual costs for the 54 properties in some or all of the three categories outlined above that add up to $602,173.87. This results in an average loss of $11,151.37 for each of the 54 properties for which the government has usable, concrete information. This $602,173.87 conservative amount should serve as the floor for purposes of any restitution order.

However, the government would respectfully ask the court to consider the properties for which no loss amount was provided, or for which loss was provided, but the cost breakdown provided was too conclusory or speculative to include. As indicated, the government has identified and contacted about 159 lender-victims relating to 302 properties, of which the government received responses with quantifiable losses as to 54 properties. The government believes it would be appropriate to award for each of the other 248 properties (302-54) the average, conservative loss estimate of $11,151.37 per property. It is reasonable to conclude by a preponderance of the evidence that the costs and losses associated with each of the 302 properties was at least $11,151.37, since most of the submissions of losses far exceeded this figure. Such an order would result in an additional restitution payment of $11,151.37 for each of the remaining victims associated with the 248 remaining properties that we know were forced to file relief from stay motions, but for whatever reason their counsels did not respond or did not respond satisfactorily. This amount of restitution would result in an additional restitution amount of $2,765,539.76, and when added to the $602,173.87, results in a total restitution amount of $3,367,713.63.

In the alternative, if the Court is uncomfortable finding that the $11,151.37 average restitution amount should be added for each of the remaining 248 properties, then, at a minimum, the Court should find that the $700 attorneys' fee and costs incurred for filing each relief from stay motion should be awarded for each of these additional 248 properties. $700 reflects the amount that the lenders or their counsels have identified as the fees for filing each relief from stay motion.

The government respectfully disagrees with the calculation of the Probabtion Office as set forth in the revised PSR, as that calculation only includes attorneys fees and costs (category one

above), which are just a fraction of actual costs incurred by the lender-victims who responded to the government's request.

      If the Court seeks additional information on restitution, it may consider ordering a restitution hearing on the matter, at which point the government would be prepared to present additional evidence of actual losses to the victims.

## <u>SUMMARY</u>

WHEREFORE, the Government requests that the Court impose a 61-month sentence based on the Federal Sentencing Guidelines and the factors identified in 18 U.S.C. § 3553(a).

Respectfully submitted,

ROBERT PITMAN
UNITED STATES ATTORNEY
Western District of Texas

DENIS McINERNEY
Chief
Fraud Section, Criminal Division
U.S. Department of Justice


By:  _____/s/_____
Paul M. Rosen
Trial Attorney
Fraud Section, Criminal Division
U.S. Department of Justice
1400 New York Avenue
Washington, D.C. 20530
Phone:  (202) 353-7696
Fax: (202) 514-0152
Paul.Rosen@usdoj.gov

15

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of April, 2012, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF, which will then send a notification of such filing

(NEF) to the following:

        Joseph Andrew Turner, Esq.
        1504 West Avenue
        Austin, TX 78701
        Phone: (512) 474-4892
        Fax: (512) 474-8252
        Email: joeturnerpc@gmail.com

    By: _____s/_____
        Paul M. Rosen
        Trial Attorney
        Fraud Section, Criminal Division
        U.S. Department of Justice
        1400 New York Avenue
        Washington, D.C. 20530
        Phone: (202) 353-7696
        Fax: (202) 514-0152
        Paul.Rosen@usdoj.gov